# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### February 4, 2014 Session

## STATE OF TENNESSEE v. PAMELA TAYLOR

**Appeal from the Criminal Court for Shelby County**
**No. 10-06598    W. Otis Higgs, Jr., Judge**

---

**No. W2012-02535-CCA-R3-CD  - Filed September 30, 2014**

---

The Defendant, Pamela Taylor, was indicted for the first degree premeditated murder of her husband, Michael Taylor. Following a jury trial, she was convicted of second degree murder. The trial court sentenced her as a Range I, violent offender to twenty-one years in the Tennessee Department of Correction. On appeal, the Defendant argues: (1) the trial court erred in declining to suppress her statement to police; (2) the trial court erred in abbreviating voir dire and jury selection, which prevented her from properly questioning prospective jurors and kept her from invoking her last two peremptory challenges; (3) the ex parte communication between two senior attorneys with the district attorney's office and the trial judge created an appearance of impropriety; (4) the successor judge erred in finding that the presiding judge had satisfied her duty as the thirteenth juror; (5) the trial court erred in admitting opinion testimony requiring specialized and/or expert knowledge; (6) the trial court erred in admitting evidence of her character and her prior bad acts; (7) the State committed pervasive prosecutorial misconduct; (8) the trial court erred in excluding evidence of the victim's violence, anger, and aggression, which were offered as corroborative evidence that the victim was the first aggressor; (9) the evidence was insufficient to sustain her conviction for second degree murder; and (10) the trial court erred in imposing an excessive sentence. Upon review, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

André C. Wharton and Alexander C. Wharton, for the Defendant-Appellant, Pamela Taylor.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Patience R. Branham and

Charles Summers, III, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

## Trial

On December 23, 2009, the Defendant, Pamela Taylor, fatally shot her husband Michael Taylor. In her appellate brief, the Defendant provided an abbreviated statement of the evidence presented at trial. As we will explain, there was sufficient evidence to support the Defendant's conviction for second degree murder.

### State's Proof

Diane Welch, the victim's mother, testified that although the Defendant was married to the victim at the time of his death, the victim intended to divorce the Defendant and to move in with her and her husband until he could get a one-bedroom apartment. Ms. Welch stated that the Defendant and the victim had met as teenagers and that the Defendant had been pregnant with the victim's child when she graduated from high school. However, she said the victim never married the Defendant until their child, Brittany, was nearly seventeen years old. Prior to his marriage to the Defendant, the victim was married to Wendy Taylor, and their marriage lasted several years before ending in divorce.

Ms. Welch stated her belief that the Defendant was a very jealous girlfriend and wife. Over the years, she had seen the Defendant get angry if other women paid attention to the victim. When the Defendant and the victim were approximately twenty-four years old, the Defendant suddenly appeared when the victim and his date returned home, and the victim had to restrain the Defendant so that the other woman could get into her car to leave. Ms. Welch also stated that the Defendant grabbed another woman by the head and pushed her after the woman tapped the victim on the back. She had seen the Defendant sitting outside in her car and had observed her driving back and forth in front of her home when the victim lived with her. Ms. Welch asserted that the victim was not a violent person and that she had never seen him angry with the Defendant or possessive of her. She never saw any evidence that the victim was physically abusing the Defendant, and the Defendant never complained of abuse and never told her that she was afraid of the victim.

Brittany Taylor, the daughter of the Defendant and the victim, testified that she had never seen the victim act violently toward another person. However, she acknowledged that the victim had yelled at her or her sisters if they were misbehaving and had yelled at the Defendant when they argued. One time she saw the victim push the Defendant but never

observed any other incidents between them. Brittany[1] said she never observed any bruises or marks on the Defendant. During one incident, the victim became angry and pushed some things off the counter top, breaking a ceramic bowl she had made. She also said that the victim regularly broke video game controllers and that she had seen him break a golf club after hitting a bad shot. She said she had never seen the victim break any furniture. Brittany was aware that victim smoked marijuana and used steroids.

On December 22, 2009, at 9:28 a.m., Brittany received a text message from the Defendant, stating, "Please come to the apartment." At 10:28 a.m., she received another text message from the Defendant, which said, "The police just left." Then, at 10:42 a.m., the Defendant sent a third text message, stating, "You have got to get your stuff. Dad is losing it." After receiving this third text, Brittany and her boyfriend went to her parents' apartment to pick up some of her furniture. When she arrived, she saw the victim outside doing some work, and he nodded to her. That night at 9:16 p.m., the Defendant sent Brittany the following text message:

> Dad and I are fine. Please don't worry about anything . . . It's back to normal for the night. I'm working tomorrow and you got the items out of the apartment that he likes to threaten or break. He moved on to threatening me now . . . ha. I think he is going to bed and I am tired too. Love you lots.

On December 23, 2009, around 9:00 a.m., Brittany received the following voicemail message from the Defendant: "Please call Nana, your dad has attacked me again." Brittany drove to her parent's apartment, where she discovered that the Defendant had shot and killed the victim.

John Simmons, Brittany's boyfriend, stated that on the afternoon of December 22, 2009, he took Brittany to her parents' apartment to get her furniture. When they arrived, they saw the Defendant, who "seemed fine." Mr. Simmons stated that he was in the apartment for approximately thirty to forty-five minutes and did not observe any marks or injuries on the Defendant. He said he had never talked to the victim about steroids and had never noticed any aggressive behavior from the victim. He said the victim's mood was "very consistent."

Edie Lloyd, the office manager of the corporate office of Fogelman Management Group, testified that the day of the victim's funeral, the Defendant called her. During this call, the Defendant asked if the victim's last paycheck would deposit onto his iPay card. The Defendant also asked about the victim's life insurance and 401K benefits. The Defendant

---

[1] Because many witnesses share the same last name, we will refer to them by their first names.

told Ms. Lloyd, "I know I'm the beneficiary and I don't have a job right now." She said she needed this money "for Brittany and for [the victim's mother] and the funeral."

Stephanie Joyner, the human resource manager at Fogelman Management Group, testified that the victim had been employed at the Madison Apartments as the maintenance supervisor. She stated that on December 22, 2009, she received an email from the victim's manager stating that the victim wanted to remove the Defendant as a beneficiary from his $97,000 life insurance policy and his other benefits effective January 1, 2010, because they had just had a big disagreement. Ms. Joyner informed the victim's manager that the victim would have to make any changes in writing, but she never received anything from the victim prior to his death.

Wendy Taylor, the victim's ex-wife, testified that she had been married to the victim for seven years before they amicably divorced. She stated that although the victim took steroids during their marriage, he did not have anger problems. Wendy stated that the biggest problem in their marriage was that the victim was nonconfrontational and would leave anytime they had an argument. She asserted that the victim was never physically abusive or violent with her. When she and the victim separated during their marriage and then reconciled, the Defendant informed Wendy that she and the victim had dated during their separation. Wendy stated that the Defendant "was obsessed with" the victim during their marriage. She also said that the Defendant frequently prevented the victim from seeing Brittany if he did not do as she asked, which "was a headache throughout the marriage."

Timothy Maness, who worked with the victim at the Madison Apartments, testified that he and the victim were best friends. He said the victim did not have an anger problem, and he described the victim as "laid back" and "friendly." However, Mr. Maness said that the Defendant had a reputation for being a "possessive wife." He recalled one time that the Defendant called him for the purpose of checking up on where the victim had been the day before.

Mr. Maness said that he used steroids with the victim and that the victim was "very particular" about the kinds of steroids he used. He stated that the victim took no more than two twelve-week cycles of steroids a year. He said the victim's steroid use never changed his attitude toward people and never made him more aggressive or angrier. He also said the victim's marijuana use did not make him angry or aggressive.

Mr. Maness recalled that during the last six months of the victim's life, the Defendant "kept losing jobs," which irritated the victim because the Defendant "made good money." He said the victim was considering moving out of the apartment he shared with the Defendant and into a smaller apartment in the same complex.

On the night of December 22, 2009, Mr. Maness said the victim came over to his apartment to watch a basketball game, and he could tell that the victim "had something on his mind." The victim indicated that he did not want to go home to an argument with the Defendant, but when Mr. Maness offered to let him stay at his apartment, the victim declined and returned home after the game.

On December 23, 2009, Mr. Maness saw police cars and ambulances near the victim's apartment. He immediately ran over to the apartment and asked an officer about the victim. Based on the officer's reaction, he knew that something bad had happened. Moments later, he saw the Defendant sitting in the backseat of a patrol car in handcuffs. The Defendant looked directly at Mr. Maness and pointed her fingers at him as if she were firing a gun.

Keeley Greer, an officer with the Memphis Police Department and a courtesy officer for the victim's and the Defendant's apartment complex, testified that he often received a shot of testosterone from his doctor and that he knew "many" other police officers who used steroids. He stated that although he had never talked to the victim about whether the victim used steroids, he never observed the victim having anger problems. On December 22, 2009, in the early morning, Officer Greer received a call from the Defendant, wherein the Defendant said that she and the victim had gotten into an argument and that the victim had locked her out of the apartment. He told the Defendant that she needed to call the police because he was their friend and because he did not deal with domestic violence issues as a courtesy officer. Later that afternoon, Officer Greer saw the victim, who looked frustrated, working out at the gym. He acknowledged that the victim had a temper when he was unable to fix something at his maintenance job at the apartment complex.

Vivian Williams, a 9-1-1 dispatcher for the Memphis Police Department, testified that on December 22, 2009, at 9:11 a.m., she received a call from the apartment the Defendant shared with the victim. She remembered this call because it was "a little bit odd." She explained:

> [O]n the phone call [the Defendant] was saying that she was being attacked by her husband but as dispatchers we've learned to listen to background noises, if there's any yelling or screaming or and typically a person that's being attacked cannot hold a phone and talk to you. The phone would either fall or drop or you'd hear the fighting noises in the background o[r] whatever. But it was extremely quiet that day when she said she was being attacked, the background was quiet.

Parke Harber, an officer with the Memphis Police Department, testified that on December 22, 2009, he responded to a report of a domestic disturbance at the Defendant's

apartment. When he arrived, the Defendant was "real calm." He said that the victim's clothes were not in disarray, that he did not see any marks or bruises on the Defendant, and that the Defendant did not say that she was injured. The Defendant told him that she and the victim had been arguing and that she had made the decision to call the police when "she thought that things were going to escalate . . . ." Officer Harber said he did not see anything out of place in the apartment and did not make a domestic violence report.

James Gaddy, another officer, testified that he went with Officer Harber to the Defendant's apartment in response to her 9-1-1 call. The Defendant told him that she and her husband had been arguing. Officer Gaddy noted that the Defendant did not have any injuries and that her hair was not out of place. He did not make a domestic violence report because there were no signs of a physical altercation.

Steve Dover, a supervisor for the Cash America Pawn shop on Summer Avenue, testified that on December 22, 2009, at 3:11 p.m., the Defendant pawned several pieces of gold jewelry at his shop. After calculating the value of this jewelry, he gave her a loan of $350.

James Simonton, the owner of the Guns and Ammo shop on Summer Avenue, testified that on December 22, 2009, at approximately 4:30 p.m., the Defendant bought a .38 Smith and Wesson Model 642 revolver. Mr. Simonton said that the Defendant paid for the handgun with cash and did not appear nervous or scared at the time she bought the gun.

Aaron Lamey testified that he lived in the apartment directly above the apartment shared by the Defendant and the victim. He stated that prior to December 23, 2009, he had never heard any loud noises coming from the victim's apartment. However, on the morning of December 23, 2009, he awoke "very suddenly" and looked at his clock at 8:39 a.m. He said he thought he had heard a gunshot in his dream or had been shot in his dream and was "a little frightened" when he awoke. He then heard a "loud . . . bang noise" that came from either above or below him in the apartment complex. He said he did not hear anything out of the ordinary after he awakened.

Milton Williamson, a dispatcher with the Memphis Police Department, testified that on December 23, 2009, at 8:48 a.m., he received a 9-1-1 call from the Defendant. He said that during the call, the Defendant became hysterical, and he could not understand what she was saying.

J.D. Downs, an officer with thirty-two years experience with the Memphis Police Department, testified that he was the first officer to respond to the crime scene after receiving notice of a shooting. When the Defendant answered the door, she appeared to be "very

nervous" and did not say anything to him. He patted the Defendant down and observed that she was wearing a large yellow sweatshirt. Officer Downs stated that the Defendant did not look like she had any injuries. Shortly thereafter, the Defendant was placed in a squad car.

Officer Downs said he noticed that some of the furnishings in the apartment had been knocked over or pushed down. He asserted that the crime scene did not look as if a real fight had occurred and instead looked like it had been "staged." He walked into the master bathroom and saw the victim's body on the floor. The victim had one bullet wound in his chest, and he was lying on his back with blood coming from his head. A short time later, other officers arrived. Officer Downs acknowledged that some of the officers spoke to the Defendant inside her apartment but did not remember what the officers said to her or what the Defendant's responses were. Officer Downs later transported the Defendant to the police station. When they got out of the patrol car, two women told the Defendant not to say a word because they had hired attorney Leslie Ballin to represent her.

Elizabeth Mise, another police officer, testified that she arrived at the crime scene a few minutes after Officer Downs. When she placed the Defendant in the back of the squad car, she noticed that the Defendant did not have any injuries and did not have any blood on her or her clothes. Officer Mise said that when the Defendant was told that the victim was dead, she appeared to be upset and crying, although she seemed to be making more noise than shedding tears.

Adam Merrit, an officer with fourteen years of experience with the Memphis Police Department, testified that he also responded to a call of "[s]hots fired" at the Defendant's apartment. When he walked inside the apartment, he noticed, based on his experience in responding to "[h]undreds if not thousands" of crime scenes, that the chairs in the apartment looked as if they had been overturned and that nothing on the floor was broken. Officer Merritt stated that the significance of his observations was that "the items were probably placed there."

Mundy Quinn, a sergeant with the Memphis Police Department's homicide bureau, testified that he investigated the victim's murder. Upon arriving at the crime scene, he noticed that some chairs had been knocked over in the dining area. He entered the master bedroom and saw that a hamper had been "knocked over with some clothes that looked like they had been pulled out." He also saw the victim, who had a gunshot wound to his chest, in the master bathroom. He noted that the victim had hairs on one of his fingers, which indicated a possible struggle. He said other officers found a .38 Smith and Wesson snub nose revolver "between a wall and a dresser."

Sergeant Quinn asked the Defendant if she would sign a consent form for the officers to search the apartment, which she signed at 9:45 a.m. He said he did not ask the Defendant any questions about the circumstances of her husband's death. Sergeant Quinn did not see any injuries or blood on the Defendant, and he noticed that her hair was not "out of place." After the Defendant was arrested and transported to the police department, he advised the Defendant of her Miranda rights, which she waived before giving her statement. Sergeant Quinn stated that the Defendant never told him that she wanted an attorney and never mentioned that she had an attorney at the time he interviewed her. In her statement, the Defendant admitted that she shot the victim. She asserted that the victim had been physically abusive to her in the past. The Defendant stated that the day of the shooting, the victim, who was enraged, grabbed her by the hair and was about to choke her when she fired the gun through the sleeve of her sweatshirt.

Dr. Karen Chancellor, the chief medical examiner for Shelby County, was declared an expert in forensic pathology. She testified that the victim's cause of death was "multiple gunshot wounds." She said that one of the wounds was to the front of the victim's chest. This bullet passed through the victim's heart, destroying part of the aortic valve. She also said the victim sustained a second gunshot wound to the back of the head. Dr. Chancellor noted that the victim's body contained gunpowder particles, which indicated that the gun was fired within inches or feet of the victim's body. She stated that the victim did not have alcohol in his system but did have THC, the active component of marijuana, in his system. Dr. Chancellor tested the victim's urine for an anabolic steroid profile, but the levels for testosterone were in the normal range.

Michael Brown, a sergeant with the Memphis Police Department's homicide bureau, testified that when he arrived at the crime scene, the Defendant was "mildly upset" for "someone who had just shot someone." Sergeant Brown noted that the Defendant did not "look like she had been in a struggle for her life" when he saw her because she was calm, did not have any marks or bruises indicative of a struggle, and did not look disheveled. He noticed a hole in the sleeve of her sweatshirt. Sergeant Brown said he was also present when the Defendant gave her statement after waiving her Miranda rights. In her statement, the Defendant admitted that she had shot and killed the victim but claimed that it was "an accident." When she gave her statement, the Defendant "was crying or holding her head down like she was crying but there were no tears." The Defendant claimed that the victim was abusive and that she had called 9-1-1 on December 22, 2009, because he had choked her. She also said that on December 23, 2009, she had been asleep in her bed when the victim entered the apartment in a rage. She said the victim told her, "[M]other f*****, you're going to die today, I'm going to kill you," and he pulled the covers back and began choking her before he grabbed her by her hair and pulled her out of the bed, stating, "I'm going to snap your mother f****** neck." The Defendant said that she had the gun inside the sleeve of her

sweatshirt at the time and shot the victim. She remembered firing the gun only one time. After she signed her statement, the Defendant told the officers that the victim had "thrown furniture around" inside their apartment.

Sergeant Brown stated that the inside of the apartment did not look like "a life and death struggle had occurred before the shooting." Based on his twenty-three years of experience as an officer, Sergeant Brown believed that at least some parts of the crime scene look as if they had been "staged." For example, he said that "the chairs [had] been turned over all in the same direction and [had been] laid down" rather than "thrown around." He noted that the chairs were not damaged. In addition, he said that although the Defendant asserted that the victim had choked her on the bed, the comforter was still on the bed. Sergeant Brown admitted that some things, including the hairs found on one of the victim's fingers, corroborated the Defendant's version of events.

Jeffrey Garey, an officer with sixteen years of experience with the Memphis Police Department and a member of the crime scene investigation unit who had investigated over five hundred crime scenes, was declared an expert in crime scene investigation. Officer Garey took photographs of the crime scene and collected evidence. He recalled that the living room was in "slight disarray." He collected a .38 Smith and Wesson revolver and two hair fibers stuck to the tip and edge of the victim's middle finger. He opined that the location and appearance of the victim's body, the placement of items in the apartment, and the clothes the Defendant was wearing looked as if they had been "staged or prearranged." Officer Garey noted that one chair from the dining room and two bar stools looked as if they had been knocked over from their original position rather than "thrown in a fit of rage." He also noticed that the chair and stools were not damaged. When he collected the Defendant's sweatshirt, he noticed that there was a hole in the lower part of the right-hand sleeve. He used an alternative light source to look for "bruising that ha[d] not yet come to the surface" of the Defendant's skin but found no indication that she had sustained any injuries.

**Defense's Proof**

Gordon Summerfield testified his daughter played competitive basketball with Brittany, the Defendant's daughter. He stated that the Defendant was a "[g]reat mom" with a "[s]weet disposition."

Deanna Dixon, the Defendant's friend, testified that she and the Defendant had gone to nursing school together and had worked together for several years at Youth Villages. She stated that she promoted the Defendant at Youth Villages and took the Defendant with her when she went to another department. When Ms. Dixon left her job in 2003, she recommended the Defendant for her old job as supervisor, and the Defendant was given that

job.  Ms. Dixon stated that she was not aware that the Defendant's contract had not been renewed at Youth Villages.

Ashley Montgomery testified that she had known the Defendant since 1995 and had worked with her as a nurse at Youth Villages.  She stated that the Defendant was an excellent nurse and was "extremely compassionate about the kids in need at Youth Villages."  Ms. Montgomery said that when she left her supervisory position with Youth Villages in 2008, she recommended to her boss that the Defendant take her position.  She said the Defendant interviewed for the job but turned it down because of the schedule.

Dr. Timothy Robert, a laboratory director for Aegis Sciences Corporation and a Ph.D. in biomedical sciences with a concentration in pharmacology, was declared an expert in toxicology.  He testified his lab tested the victim's blood, which tested positive for THC, a component of marijuana.  He also said his lab performed an anabolic steroid analysis on the victim's urine sample.  This analysis revealed that the victim's levels of Nandrolone were higher levels than what is naturally produced by the body, which indicated the possibility that the victim was using an anabolic steroid.  In addition, the testing revealed a very low level of epitestosterone compared to a high level of testosterone, which also suggested the use of an anabolic steroid.  Dr. Robert stated that steroid use can cause side effects of "aggressivity and hostility, depression, anxiety, [and] narcissism[.]"  He also stated that "[m]arijuana is usually considered to be a central nervous system depressant and therefore usually is associated with no[n]aggressive behavior."

Robin Ost testified that she became friends with the Defendant because her daughter played basketball with the Defendant's daughter, Brittany.  She stated that she had gotten to know the Defendant well over the years and described her as caring, kind, honest, [and] level[]headed."  She said she had never observed any violent behavior from the Defendant and would not describe the Defendant as a jealous or possessive woman regarding the victim.  Ms. Ost stated she knew the Defendant owned a gun.

The Defendant testified that she had met the victim in high school and that he had proposed to her the night of graduation.  When she discovered she was pregnant with their daughter Brittany, she and the victim moved into an apartment together.  While they were living in the apartment, the victim accused her of stealing his marijuana and picked her up by the throat and slammed her against a wall.  During a different incident, the victim threw her around the apartment and threw furniture out into the courtyard of the apartment complex but left before the police arrived.  The Defendant also said that the victim once attacked a family friend because he had danced with her.  She said that she eventually moved out of the apartment they shared and moved in with her grandmother.

The Defendant said that in 2007, the victim asked her to move in with him, and they were married in February 2008. Once they got married, she and the victim went to court to have his child support payments stopped. However, in August 2008, the victim became "livid" because the court tried to garnish his wages for unpaid child support. During the ensuing argument, he picked up a knife in the kitchen and threw her to the ground. When she ran away, the victim threw a phone book at her head. The Defendant said that the garnishment had been a mistake, and she corrected the situation with the court. However, she said that the victim no longer trusted her after this incident.

The Defendant stated that the victim would have times of "unbelievable anger" and would break video game controllers, furniture, and ceramic bowls that Brittany had made. She said that she often received calls from Brittany, who said the victim was "yelling and screaming" for no apparent reason. The victim told the Defendant that he was using steroids and during the spring and summer of 2009, she said the victim was "more depressed," "more moody," and "[m]ore short tempered." During the summer of 2009, the victim often called her terrible names and shoved her and threw her around during arguments.

In October 2009, the victim attacked her while he was fixing the washing machine. She said he "clothes line[d]" her and threatened her with a screwdriver. After this incident, she contacted an attorney and told the victim that she wanted a divorce. In November, the victim threw her into a chair and informed her that he should have thrown her through the glass window behind the chair.

The Defendant said that shortly before the victim's death, he had agreed to move in with his mother until he could get a one-bedroom apartment. On December 22, 2009, she said the victim came into their apartment in a rage and told her that she was "crazy as hell if [she] thought that [she] was going to leave him hanging with all these bills . . . ." She said the victim choked her and said he was going to break everything in the apartment. When the victim realized that she had called the police, he left. She then sent a text message to Brittany, telling her to get her things out of the apartment. After Brittany got her belongings, the Defendant went to a pawn shop for a loan and then bought a handgun and hollow point bullets. That night, she loaded the gun with the hollow point bullets. Although the victim was not supposed to be at their apartment that night, he entered the apartment while she was doing laundry, and she took her cell phone and keys and locked herself in Brittany's room. She spent the entire night in that room and was so scared that she did not sleep. The next morning, December 23, 2009, after the victim left for work, the Defendant exited Brittany's room and took a nap in the master bedroom. She awoke to the victim screaming, "Motherf*****, are you ready to die, I'll f****** kill you, are you ready to die?" The victim began choking her and pulled her out of bed by her hair. She said that she had the gun in the pocket of her sweatshirt and grabbed it as it was about to fall out. The victim pulled her to

the bathroom and said he was "fixing to snap [her] fucking neck . . . ." The Defendant said, "[W]hen my neck went up and back, I pushed." She turned around, saw that she had shot the victim, and called 9-1-1. She said she "never meant to hurt the victim."

Lawrence Renner, a forensic analyst, was declared an expert in the field of crime scene forensics. He testified that he was contacted by the Defendant to review the evidence collected in this case. Renner opined that the gun was more than two to three feet away from the victim when it was fired and noted that the medical examiner had reached a similar conclusion. He also concluded that the shot to the victim's chest occurred before the shot to the head. Renner believed that the two hair fibers found on the victim's finger were consistent with the Defendant's claim that the victim had grabbed her by her hair prior to the shooting.

### State's Rebuttal Proof

L.T.,[2] the victim's youngest daughter, testified about an incident a month or two before the victim's death when she and her sister C.T. spent the night with the victim and the Defendant. That night around 9:30 p.m., C.T. threw a phone against the wall, which made a noise. The Defendant came into the bedroom, turned off all the lights and television, and told them to go to sleep. After this incident, L.T. and C.T. were scared of the Defendant, but they continued to visit the apartment because they wanted to see the victim.

After hearing the proof at trial, the jury convicted the Defendant of the lesser included offense of second degree murder. The trial court subsequently sentenced the Defendant as a Range I, violent offender to twenty-one years in confinement.

### ANALYSIS

**I. Denial of Motion to Suppress.**[3] The Defendant argues that the trial court erred by denying her motion to suppress her confession to the police. She claims that her initial unwarned statements at the crime scene tainted her subsequent verbal and written statements to the detectives at the police station. She also argues that her statements should have been suppressed because the detectives continued to question her after she told them that she was represented by counsel.

---

[2] We refer to minor witnesses by their initials to protect their anonymity.

[3] We have renumbered the Defendant's issues for clarity.

At the hearing on the motion to suppress, Sergeant Brown and Sergeant Quinn testified that because the Defendant was not questioned about the details surrounding the victim's murder at the crime scene, she was not informed of her <u>Miranda</u> rights. Sergeant Quinn acknowledged that he had a spiral notepad but that he did not bring it to the apartment the day of the incident. He also stated that although he spoke with the Defendant when he arrived at the scene, he did not ask her what happened and instead asked her to sign a consent to search the apartment. Sergeant Brown and Sergeant Quinn stated that the Defendant was read her <u>Miranda</u> rights prior to questioning at the police department and that the Defendant knowingly and voluntarily signed the advice of rights form, thereby waiving her rights and indicating that she wanted to speak with police. They said the Defendant did not appear confused at the time, although she appeared to be crying and upset. Specifically, Sergeant Brown said, "I did see [the Defendant] making [crying] sounds, laying her head on the desk but whenever she rose up I saw no tears." Sergeant Brown and Sergeant Quinn both said that the Defendant never asked for an attorney during questioning and never indicated that she no longer wanted to give a statement. When Sergeant Quinn was asked if defendants are allowed to make a phone call, he responded:

> If they ask for an attorney and then we stop the interview. If I'm interviewing her because she killed her husband I'm not going to just give her the phone. If she [was] sitting talking to us. She freely was giving us the statement. But she never, in my supplement it doesn't say she asked to use the phone.

Sergeant Quinn stated that he was never made aware that the Defendant had an attorney.

Sergeant Brown and Sergeant Quinn stated that the Defendant was never threatened or coerced into signing the advice of rights form. They also stated that the Defendant freely and voluntarily gave them her statement. Sergeant Quinn stated that he typed the Defendant's statement. Sergeant Brown said the Defendant reviewed her statement, wrote some corrections in by hand, initialed each page, and signed the document.

Donna Rodgers, the Defendant's aunt, testified that she followed behind the patrol car that took the Defendant to 201 Poplar. She was present when the officer took the Defendant out of the car, and she told the Defendant, "Pam, your attorney is Leslie Ballin and that's who we got." She said she told the Defendant this information three times as loudly as she could, and she was sure that the Defendant heard her. Rodgers said that there was only one officer with the Defendant at the time, and he pushed the Defendant into the building.

The Defendant testified that both Sergeant Brown and Sergeant Quinn talked to her at her apartment on December 23, 2009. She stated that once the weapon was found, she was

placed in the back of a patrol car for a substantial amount of time until she asked to be allowed back inside the house because she was scared and cold. She said that she was eventually allowed inside the house, and a female officer was with her at all times, including when she went to the bathroom. The Defendant stated that she was not free to leave when the officers arrived.

The Defendant said that she gave some of the information contained within her written statement to officers while she was at her apartment. She asserted that Sergeant Quinn was taking notes in a small spiral notebook. The Defendant said that she was never advised of her Miranda rights at her apartment. When the officer took her out of the patrol car downtown, she saw Rodgers, who told her that her attorney was Leslie Ballin before the officer took her into the police station.

The Defendant said that she was in a room for about five minutes when Sergeant Brown and Sergeant Quinn entered the room. She said Sergeant Brown and Sergeant Quinn began asking her questions, and when she said she needed her attorney, the officers would say, "[T]his is nothing we haven't already talked about [at the apartment]." The officers told her that they were just going to do a statement, and she continued to answer their questions even though she was in "shock" and was "despondent[.]" She stated that when she asked for an attorney, Sergeant Brown told her that this "sound[ed] like a clear case of self-defense. We just need to get, get this statement done . . . so you can get . . . out of here." She said that this dialogue about self-defense occurred at least twice, one of which took place when Sergeant Quinn was present. She said Sergeant Brown and Sergeant Quinn kept rewording what she had said to them. When they asked her to read the advice of rights form, she told them, "I can't comprehend, . . . I need, I know I need an attorney to guide me though this, like to help me understand." She said that whenever she told Sergeant Brown and Sergeant Quinn that she needed her attorney, "they would get frustrated" and at one point actually left the room. Sergeant Quinn also told her that her attorney Leslie Ballin knew she was at the police station. Sergeant Brown also said, "[D]o you think we are stupid, we know you can read." At the time, she said she told the officers that she was exhausted because she had not slept more than two hours in two days and had pain in her head, neck, and shoulder. Then a white female officer, who she thought was Sergeant Harris, took her clothes and took cheek swabs. The Defendant said she told Sergeant Harris that she needed her attorney, and Harris responded "that she had called Mr. Ballin['s] office and that he was in court and he would be up when he got finished." Sergeant Harris also told her that Mr. Ballin knew that she was there. When she told the officers that she knew she had a right to a phone call, they told her that she was not under arrest, that she was not in trouble, and that individuals only have a right to a phone call when they are arrested.

The Defendant said that after Sergeant Quinn typed her statement, she said she could not sign the statement, and Sergeant Quinn "got very upset, threw the paper, his pen, flew back in his chair and he was very abrasive, very gruff." She said that she never read her statement before she eventually signed it. However, she admitted that she had handwritten the correction that the victim had thrown furniture around their living room during the incident. She asserted that she was doing "what they told me to do."

Peggy Barks, the Defendant's mother, stated that she told Sergeant Brown twice at 201 Poplar that the Defendant was represented by Leslie Ballin, and he just "brushed it off" and said "they would contact the attorney from upstairs." She also told Sergeant Quinn three different times that Mr. Ballin represented her daughter, and when she asked if he was there, they told her "not yet." When she asked to see her daughter, the officers kept telling her that she would see her later. Following the suppression hearing, the trial court filed an order denying the Defendant's motion to suppress her statements to police.

It is well-established that "'a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.'" State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23. However, this court's review of a trial court's application of the law to the facts is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)). Whether a defendant's request for counsel is equivocal or unequivocal is a mixed question of law and fact that is also subject to de novo review. State v. Climer, 400 S.W.3d 537, 556 (Tenn. 2013).

**A. Later Statements Tainted by Earlier Statements.** The Defendant argues that her statements should have been suppressed because her initial unwarned statements at the crime scene tainted her subsequent verbal and written statements to the detectives at the police station.

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. However, an accused may waive the right against self-incrimination, assuming the waiver is made voluntarily, knowingly, and intelligently. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Pursuant to Miranda, a suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Id. at 479. A court must look to the totality of the circumstances in determining whether a defendant has validly waived his Miranda rights. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992) (citations omitted). A court should consider the following when looking at the totality of the circumstances:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

State v. Huddleston, 924 S.W.2d 666, 671 (Tenn.1996) (citations omitted).

The trial court, in its findings of fact, stated that as soon as the officers arrived on the scene, they placed the Defendant in the back of a patrol car. It noted that no evidence was presented that the officers questioned the Defendant while she was in the patrol car. The court found that the Defendant was eventually brought back inside her apartment and told to sit on the couch while the officers continued their investigation. At a later point, Sergeant Quinn presented the Defendant with a Consent to Search form, which she signed. She was then taken to the police station, where she subsequently waived her Miranda rights before giving a written statement. The trial court's findings of fact indicate that the Defendant never provided a statement to officers until after she had waived her Miranda rights at the police station.

Regarding the issue of whether the Defendant had knowingly and voluntarily waived her Fifth Amendment rights at the police station, the trial court held:

> In the case at hand, Defendant knowingly and voluntarily waived her Fifth Amendment rights to counsel and silence. After being informed that she had an attorney, Defendant voluntarily signed an "Advice of Rights" form, which contained a written Miranda warning followed by two statements, signed by Defendant, indicating that she comprehended her rights and was willing to talk with law enforcement. Additionally, Officer Brown read the Advice of Rights form out loud to her. Defendant admits that she can read and write and that she is a licensed nurse. While Defendant claims that she inquired about an attorney, Defendant's actions in signing not only the Advice of Rights form but later signing and adding to her typed statement contradict her assertion.
>
> . . . .
>
> The totality of circumstances surrounding Defendant's statement indicates that her waiver was both knowing and voluntary. Defendant was 38 years old at the time of questioning. She has 14 years of education and is a licensed nurse. Nothing in the record indicates that she was intoxicated or incapacitated in any way during the questioning. The Defendant responded articulately and intelligently to the Officers' questions. There has been no evidence put forth that would indicate malingering on the Defendant's part, with the exception of some instances of mild hesitation in responding to questions. Finally, the Officer[s] read the Advice of Rights containing the Miranda warnings to the Defendant, and she signed an acknowledgment that she understood those rights. Defendant's lack of familiarity with the criminal process is not dispositive, as many defendants are not knowledgeable of the law or the judicial process.

In its order denying the Defendant's motions for new trial, the successor court held that the trial court properly declined to suppress the Defendant's statements to police:

> This court finds defendant has failed to demonstrate that the evidence contained in the record preponderates against the findings of fact made by the trial court. See State v. England, 19 S.W.3d 762, 766 (Tenn. 2000). Moreover, this court finds the trial court properly applied the law to the facts to conclude that the defendant's statement was voluntarily and knowingly given. . . .

-17-

We conclude that the evidence does not preponderate against the trial court's implicit finding of fact that the Defendant made no statements to police prior being advised of her Miranda rights at the police station. Based on our review of the record, it is not entirely clear what, if any, statement from the crime scene the Defendant claims should have been suppressed. It was not identified in the Defendant's motion for new trial or in her brief to this court. Moreover, the record fully supports the trial court's conclusion that the Defendant knowingly, voluntarily, and intelligently waived her Miranda rights prior to giving a statement to officers. Accordingly, the Defendant is not entitled to relief on this issue.

**B. Request for Counsel.** The Defendant also argues that her statements should have been suppressed because the detectives continued to question her after she told them that she was represented by counsel.

In Miranda v. Arizona, the United States Supreme Court generally stated that the right to counsel is invoked when an individual "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking . . . ." 384 U.S. at 444-45. However, eight years later in Davis v. United States, the United States Supreme Court adopted a significantly narrower standard for invoking a right to counsel under the Fifth Amendment when it held that "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" 512 U.S. 452, 458-59 (1994) (quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)).

Whenever a suspect invokes his right to counsel, law enforcement must stop questioning until the suspect's attorney is present unless the suspect initiates further communication. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). An invocation of the right to counsel may be made "in any manner and at any stage of the process[.]" Miranda, 384 U.S. at 444-45. Once the suspect invokes his right to counsel, any later statement made by a defendant as a consequence of interrogation by police must be suppressed. Edwards, 451 U.S. at 487.

Whether the suspect made an equivocal or unequivocal request for counsel is a question of fact. State v. Farmer, 927 S.W.2d 582, 594 (Tenn. Crim. App. 1996). In Davis, the United States Supreme Court stated that although it is a good policy for law enforcement to clarify whether a suspect has actually asked for an attorney when the suspect's request is ambiguous, it "decline[d] to adopt a rule requiring officers to ask clarifying questions." Davis, 512 U.S. at 461. The Court explained, "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id. at 461-62.

In the 2003 decision of State v. Saylor, the Tennessee Supreme Court clarified the standard for invoking the right to counsel:

> [W]e hold today what we implicitly held in Huddleston: The standard for a valid invocation of the right to counsel is the same under both Article I, Section 9 [of the Tennessee Constitution] and the Fifth Amendment. The accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable [police] officer . . . would understand the statement to be a request for an attorney." Huddleston, 924 S.W.2d at 670 (quoting Davis, 512 U.S. at 459, 114 S. Ct. [at 2355]). If the suspect fails to make such an unambiguous statement, police may continue to question him without clarifying any equivocal requests for counsel. Id.

Saylor, 117 S.W.3d at 246 (internal footnote omitted).

The trial court, in its finding of fact, held that although the Defendant knew that her family had retained counsel for her, she signed a waiver of rights within two hours of arriving at the police station and gave a statement confessing to fatally shooting the victim. Regarding the issue of whether the Defendant requested an attorney during her interrogation, the court held:

> Defendant testified at the hearing on the Motion to Suppress that she requested an attorney during her interrogation. This assertion is contradicted, however, by the Defendant's subsequent waiver of her rights to counsel[,] the statement that followed, as well as Officer Brown and Officer Quinn's testimony at the hearing. No credible evidence has been introduced that would indicate coercion on the part of Officer Brown or Officer Quinn. Additionally, the Defendant was aware that her family had retained an attorney for her representation, and chose to speak to police anyway. "Once it is determined that a suspect's decision not to rely on [her] rights was not coerced, that [s]he at all times knew that [s]he could stand mute and request a lawyer, and that [s]he was aware of the State's intention to use [her] statements to secure a conviction, then the analysis is complete and the waiver is valid as a matter or law." Moran v. Burbine, 475 U.S. 412, 423 (1986).

The evidence presented at the suppression hearing and at trial does not preponderate against the trial court's finding of fact that the Defendant knew that her family had retained an attorney and chose to speak to police anyway. In addition, the record fully supports the trial court's conclusion that Sergeant Quinn and Sergeant Brown had no obligation to stop questioning the Defendant and that her statements did not violate her Fifth Amendment right

to counsel because the Defendant never invoked this right. Accordingly, the trial court properly denied the Defendant's motion to suppress.

**II. Voir Dire.** The Defendant argues that the trial court abused its discretion in "truncating" voir dire and jury selection, which deprived her of her "statutorily guaranteed peremptory challenges to prospective jurors" and violated her procedural due process rights under the Fourteenth Amendment. She contends that this abbreviated voir dire and jury selection prevented defense counsel from properly questioning prospective jurors and kept her from invoking her last two peremptory challenges. The Defendant claims that the trial court should have resumed voir dire in a later hearing instead of limiting voir dire to a single hearing in a first degree murder case. Although the Defendant complains about the shortened voir dire and jury selection in her case, she does not assert that she is entitled to the remedy of a reversal and new trial. We conclude that the Defendant is not entitled to relief on this issue.

The number of peremptory challenges given to a defendant is outlined in Tennessee Code Annotated section 40-18-118 and Tennessee Rule of Criminal Procedure 24(e). Code section 40-18-118 provides:

**Peremptory challenges**

Notwithstanding any other provision of law or rule of court to the contrary, in any case in which a defendant is charged with an offense punishable by death, the defendant is entitled to fifteen (15) peremptory challenges and the state is entitled to fifteen (15) peremptory challenges for each such defendant. If the offense charged is punishable by imprisonment for more than one (1) year but not by death, each defendant is entitled to eight (8) peremptory challenges, and the state is entitled to eight (8) peremptory challenges for each defendant. If the offense charged is punishable by imprisonment for less than one (1) year or by fine, or both, each side is entitled to three (3) peremptory challenges for each defendant.

T.C.A. § 40-18-118 (2010). In addition, Rule 24(e) states:

**Number of Peremptory Challenges.**

(1) Death Penalty. If the offense charged is punishable by death, each defendant is entitled to fifteen peremptory challenges and the state is entitled to fifteen peremptory challenges for each defendant.

-20-

(2) Imprisonment More Than Year. If the offense charged is punishable by imprisonment for more than one year, each defendant is entitled to eight peremptory challenges and the state is entitled to eight peremptory challenges for each defendant.

(3) Imprisonment Less Than Year or Fine. If the offense charged is punishable by imprisonment for less than one year or by fine or both, each side is entitled to three peremptory challenges for each defendant.

(4) Additional Jurors. For each additional juror selected pursuant to Rule 24(f), each side is entitled to one peremptory challenge for each defendant. Such additional peremptory challenges may be used against any regular or additional juror.

Tenn. R. Crim. P. 24(e).

The record shows that the trial court employed the procedure of selecting the jury pursuant to Tennessee Rule of Criminal Procedure 24(f)(2)(A), wherein the court made no distinction between the regular jurors and alternate jurors. Here, the trial court, with the defense's approval, used fourteen jurors to hear the case and then deselected two jurors and discharged them just before the remaining twelve retired to deliberate. Because fourteen jurors were originally selected, the State and the Defendant were each entitled to ten peremptory challenges pursuant to Rule 24(e)(4). The record indicates that the Defendant was able to use eight out of the ten peremptory challenges given to her before the trial court brought jury selection to a close. However, as we will explain, this does not require the reversal of the Defendant's conviction and the grant of a new trial.

The record shows that voir dire in the Defendant's case began at approximately 11:00 a.m. on November 28, 2011. Sometime in the late afternoon or early evening that day, the parties passed forward their first round of peremptory challenges, wherein the State challenged one prospective juror, and the defense challenged four other prospective jurors who were sitting in the jury box. These five jurors were ultimately dismissed. Immediately after, the trial court asked the attorneys to "move at a little brisker pace" so that the jury could be selected within the hour. Later, the court said, "We're going to try to keep the attorneys shortening what they have to say because most of you have heard it." Voir dire continued, and during the second round of peremptory challenges, the State challenged three prospective jurors, two of which the defense also challenged, and the defense challenged a fourth prospective juror. These four jurors were ultimately dismissed. At that time, the court commented that the parking garage where most of the potential jurors had parked closed at 7:00 p.m. Shortly thereafter, a prospective juror asked whether she would be able to get her

car out of the garage if it closed in a half hour, and the prosecutor responded that she hoped to be done with jury selection and was not sure if the trial court was going to recess or try to finish jury selection that night. The court responded, "We're not going to recess. We're going to either stop here in about ten or fifteen minutes and everybody has to bring their luggage back in the morning or the attorneys are going to finish up very quickly." Still later, the court asked the prosecutor to "finish it up if you would." At that point, defense counsel asked for a bench conference, wherein he stated:

> At the risk of jeopardizing, you know, our jury selection, I don't want to rush through it. I know it's late. I know we're compromising the jury's vehicles [parked in the garage]. But I just don't want to rush through it. I was–I'm making a suggestion and the Court, you know, you're free to do what you want, but if we stop here, just tell the jurors that they may get selected, to have their bags ready tomorrow and we get a jury in the morning. I'm just afraid that I'll rush through it, I'll miss something[.].

The trial court asked if defense counsel could agree to one of the individuals in the bottom seven to sit on the jury, and he said that he had not consulted with his client and was "not sure who we can agree to." Although the court's comment seems to indicate that the parties had already agreed to thirteen of the fourteen individuals who would hear the case, the record provides no information about who was seated in the jury box at the time or how many of these individuals had been agreed to by both sides.

The trial court responded that the prospective jurors needed to get to their cars and would have to bring their luggage back tomorrow if jury selection were not completed because the jury was going to be sequestered. When defense counsel asked if the prospective jurors could move their cars, the court stated that it would take them at least thirty minutes to do that and pointed out that it was snowing outside. The court stated that the parties needed to finish jury selection that night and that it was going to give defense counsel five more minutes to question the prospective jurors. A short time later, the court informed defense counsel that he had to stop his questioning and make his peremptory challenges. At that point, one of the prospective jurors voiced concern about getting her car before the garage closed.

During the third round of peremptory challenges, the State challenged two prospective jurors sitting in the jury box, and the defense challenged a juror sitting on the bottom row below the jury box. At that point, the court informed the defense that it was not allowing the parties to strike prospective jurors from the bottom row who were not sitting in the jury box. The court then excused the two prospective jurors that had been challenged by the State and replaced them with two prospective jurors from the bottom row and stated, "[T]hat's our

jury." The prospective juror challenged by the defense in round three was never placed in the jury box and did not hear the Defendant's case.

The next day, defense counsel argued that it was error for the court to deny them the opportunity to exercise their last two peremptory challenges. In light of the shortened voir dire and jury selection as well as the ex parte communication by two senior members of the district attorney's office, defense counsel asked for a mistrial. The judge reminded defense counsel that it was sleeting and snowing by the time she got to her car the previous night and that she was afraid that she would not have been able to get the jurors back in court the next day because of the worsening weather, which was why she wanted to have jury selection completed the previous night. The court asserted that it asked both the prosecutor and defense counsel to finish their questioning before the peremptory challenges were made. While it understood that the defense had not exercised all of its challenges, the court stated that it did not believe that what it had done constituted reversible error. The court also told the defense that it did not "see how you're prejudice[d] when you made a strike from the bottom that wasn't either of those two people [who were ultimately placed on the jury]." Defense counsel responded that it should have had the opportunity to use its remaining two peremptory strikes until they were exhausted. After listening to the defense's arguments, the court denied defense counsel's request for a mistrial. After trial and sentencing, the defense filed a motion to recuse.

At the hearing on the motion to recuse, the trial court again detailed the circumstances surrounding the end of voir dire and jury selection:

> We started [voir dire] that Monday–it was November 28th–at 11:00. We probably didn't start on time; and we had the jurors go out for lunch; and it just so happens that [the prosecutor] and [defense attorney] are a little bit long-winded; and they talked a lot to the jurors. And the parking garage that the potential jurors are urged to park in is the Jefferson Street garage; and that's where many of them parked, including one of our older [jurors] . . . . She was nervous. The weather was getting bad that evening. I do remember that. We were expected to have sleet and snow, and I believe we did; and there was a real question about whether we'd be able to start court the next morning. So I was trying to make sure we had our jury selected that night since it would be sequestered, and they have to bring their suitcases back for a ten-day trial.
>
> As we got close to 6:30, again, the parking garage closes at 7:00, many of the potential jurors that were seated in the box–what we do is we have fourteen jurors seated up in the regular jury chairs, and then we have six up front to replace those who are struck. Several of the people up top, including

-23-

the lady who was approximately eighty years old, kept looking at their watches and expressed concern about whether or not they would be able to retrieve their vehicles; and I did tell [the prosecutor] she needed to basically hurry up with her questioning; and she finished up; and then [defense counsel] got up there; and I did pretty much stop him after he started . . . and had them exercise their hopefully final peremptory challenges; and at one point . . . we essentially had thirteen jurors who had been passed over; and we had one new juror sitting up there; and we had . . . four or five jurors down on the folding chairs. So, much to my dismay, the State challenged the new juror; and [defense counsel] challenged one of the jurors from the bottom row, which is not a valid strike. Once the juror from the jury box was excused, it was ten til 7:00. I replaced him or her with one of the members–let me try to recall it. There were about four people down bottom. [Defense counsel's] strike was, I believe Juror No. 4 at the bottom and replaced with somebody further up the line from that person and said, "We have our jury. And [both defense counsel] objected; said, "We still have peremptory challenges left." I said, "Well, you–you–the only challenge that you just exercised was not even in the box. You passed over everybody. They objected, and I said, "I'm going to excuse this jury–they're going to come back in the morning with their luggage. I'll give you a chance to make your record in the morning; but the weather is bad, and we're going to get everyone home."

In its order denying the Defendant's motions for new trial, the successor court held that the trial court did not abuse its discretion in bringing voir dire and jury selection to a close: "Given the deteriorating weather, the late hour, and the fact that most of the prospective jurors had been repeatedly questioned by the parties, this court does not find the trial court abused its discretion in cutting off voir dire."

A defendant's right to trial by an impartial jury is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by article I, section 9 of the Tennessee Constitution. "Both the defendant and the State are entitled to a fair trial by unbiased jurors and it is the duty of the Trial Judge to discharge any juror who for any reason cannot or will not do his duty in this regard." Walden v. State, 542 S.W.2d 635, 637 (Tenn. Crim. App. 1976) (citing Boyd v. State, 82 Tenn. 161 (1884)). Moreover, every defendant is assured "'a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation.'" State v. Akins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1995) (quoting Toombs v. State, 270 S.W.2d 649, 650 (Tenn. 1954)).

"The essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by

-24-

counsel." Id. (citing 47 Am. Jur. 2d, Jury § 195 (1969)).  However, neither party has the right to select particular jurors.  State v. Smith, 857 S.W.2d 1, 20 (Tenn. 1993).  "Rules prescribing jury selection procedures are intended to protect the integrity of the jury system by providing a uniform and ordered method that ensures the accused a fair and impartial jury chosen from a fair cross-section of the community."  State v. Coleman, 865 S.W.2d 455, 458 (Tenn. 1993) (citing Kittle v. State, 362 So.2d 1271, 1274 (Ala. 1978)).  "[T]he decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court."  State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993) (citing State v. Harris, 839 S.W.2d 54, 65 (Tenn. 1992); State v. Simon, 635 S.W.2d 498, 508 (Tenn. 1982); Mu'Min v. Virginia, 500 U.S. 415, 422 (1991)).

Despite the Defendant's claims to the contrary, the Tennessee Supreme Court has held that the denial of the right to exercise peremptory challenges does not violate the Due Process Clause of the Fourteenth Amendment:

It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury, see Wainwright v. Witt, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), and the use of peremptory challenges is a means to achieve the end of an impartial jury. Ross v. Oklahoma, 487 U.S. 81, 88, 108 S. Ct. 2273, 2278, 101 L. Ed. 2d 80 (1988). However, although the right to exercise peremptory challenges is "one of the most important of the rights secured to the accused," Swain v. Alabama, 380 U.S. 202, 219, 85 S. Ct. 824, 835, 13 L. Ed. 2d 759 (1965), the right to exercise peremptory challenges is not of constitutional dimension. Ross, 487 U.S. at 88, 108 S. Ct. at 2278.

As long as the jury that sits is impartial, the denial or impairment of the right to exercise peremptory challenges does not violate the Sixth Amendment. Id. In addition, because peremptory challenges are a creature of statute and are not required by the Constitution, denial or impairment of the right to exercise peremptory challenges does not violate the due process clause of the Fourteenth Amendment as long as the defendant receives what the state law provides. Id., 487 U.S. at 89, 108 S. Ct. at 2279.

Howell, 868 S.W.2d at 248.

Although an error in the denial of peremptory challenges does not amount to a constitutional error, Howell, 868 S.W.2d at 248, we acknowledge that "[t]he importance of the right to make peremptory challenges is demonstrated by the extraordinary remedy courts have traditionally afforded to an accused who was deprived of the right: reversal of

-25-

conviction, without a showing of prejudice." State v. Spratt, 31 S.W.3d 587, 598 (Tenn. Crim. App. 2000) (citing Lewis v. United States, 146 U.S. 370, 376 (1892)). Significantly, the automatic reversal noted by the Spratt Court was addressing a Batson issue, see Batson v. Kentucky, 476 U.S. 79 (1986), and this Court has since emphasized that "the holding in Spratt regarding peremptory challenges has been limited to cases involving Batson error." State v. Danny Howard, No. W2012-02109-CCA-R3-CD, 2013 WL 6254679, at * 9 (Tenn.Crim.App. Dec. 2, 2013) (citations omitted); State v. Lee C. Palmer, No. E2013-01516-CCA-R3-CD, 2014 WL 1831039 at * 2, (Tenn. Crim. App. May 6, 2014). As such, in order to invalidate her conviction on this ground, the Defendant must demonstrate that the "'error more probably than not affected the judgment or would result in prejudice to the judicial process.'" Tenn. R. App. P. 36(b); see also State v. Rodriguez, 254 S.W.3d 361, 371-72 (Tenn. 2008). For the reasons that follow, we conclude that the Defendant has failed to demonstrate such prejudice.

Although there do not appear to be any Tennessee cases directly on point regarding a trial court's denial of peremptory challenges to a criminal defendant, the case of Rivera v. Illinois, 556 U.S. 148 (2009), provides guidance on this issue. In Rivera, the United States Supreme Court determined whether the erroneous denial of a peremptory challenges required reversal of a defendant's conviction pursuant to federal law. Id. at 156. Following a jury trial, Rivera was convicted of first-degree murder in an Illinois state court. Id. at 152. Rivera appealed, challenging the trial court's rejection of his peremptory challenge to venire member Gomez based on the court's erroneous ruling pursuant to Batson v. Kentucky, 476 U.S. 79 (1986). Id. 152-53. Gomez subsequently acted as foreperson on the jury that convicted Rivera. Id. at 152. Although the Illinois Supreme Court acknowledged that the trial court should have allowed Rivera's peremptory challenge to Gomez, it held that the error was harmless and did not require reversal of Rivera's conviction. Id. The United States Supreme Court granted certiorari and affirmed the Illinois Supreme Court, holding:

> If a defendant is tried before a qualified jury composed of individuals not challengeable for cause, the loss of a peremptory challenge due to a state court's good-faith error is not a matter of federal constitutional concern. Rather, it is a matter for the State to address under its own laws.

Id. at 157. The Court explained that an error of state law regarding peremptory challenges is not a denial of due process under the United States Constitution:

> [T]his Court has consistently held that there is no freestanding constitutional right to peremptory challenges. See, e.g., Martinez-Salazar, 528 U.S., at 311, 120 S. Ct. 774. We have characterized peremptory challenges as "a creature of statute," Ross v. Oklahoma, 487 U.S. 81, 89, 108 S. Ct. 2273, 101 L. Ed. 2d

80 (1988), and have made clear that a State may decline to offer them at all. McCollum, 505 U.S., at 57, 112 S.Ct. 2348. See also Holland v. Illinois, 493 U.S. 474, 482, 110 S. Ct. 803, 107 L. Ed. 2d 905 (1990) (dismissing the notion "that the requirement of an 'impartial jury' impliedly compels peremptory challenges"). When States provide peremptory challenges (as all do in some form), they confer a benefit "beyond the minimum requirements of fair [jury] selection," Frazier v. United States, 335 U.S. 497, 506, 69 S. Ct. 201, 93 L. Ed. 187 (1948), and thus retain discretion to design and implement their own systems, Ross, 487 U.S., at 89, 108 S. Ct. 2273.

Because peremptory challenges are within the States' province to grant or withhold, the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution. "[A] mere error of state law," we have noted, "is not a denial of due process." Engle v. Isaac, 456 U.S. 107, 121, n.21, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982) (internal quotation marks omitted). See also Estelle v. McGuire, 502 U.S. 62, 67, 72-73, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).

Id. 157-58 (internal footnote omitted); but see Tuggle v. Allright Parking Systems, Inc., 922 S.W.2d 105, 107-08 (Tenn. 1996) (holding that the trial court's refusal to grant four peremptory challenges to each of the two plaintiffs in a civil suit pursuant to Tennessee Code Annotated section 22-3-105 constituted prejudice to the judicial process requiring reversal pursuant to Tennessee Rule of Appellate Procedure 36(b)); Crawford v. Heaberg, 709 S.W.2d 611, 613 (Tenn. Ct. App. 1986) (reversing the judgment of the trial court and granting a new trial because the court denied the plaintiffs in a civil suit four additional peremptory challenges as mandated by Tennessee Code Annotated section 22-3-105); Coleman, 865 S.W.2d at 458 (concluding that the trial court's procedure of selecting eighteen prospective jurors for voir dire rather than the typical twelve, allowing both sides to use all of their peremptory challenges and to make any challenges for cause, and eliminating the excess number of unchallenged jurors by excusing the last prospective jurors seated, which failed to comply with the procedure in Tennessee Rule of Criminal Procedure 24(c), was not reversible error pursuant to Tennessee Rule of Appellate Procedure 36(b) because the criminal defendant failed to prove that the jury was unfair or partial, failed to show that he was denied the use of the statutorily required number of peremptory challenges, and failed to establish that he was denied the right to exercise challenges for cause).

Ultimately, the Court in Rivera concluded that the individual States must decide whether a state-law defect deprives a court of its legal authority, thereby necessitating reversal and a new trial:

States are free to decide, as a matter of state law, that a trial court's mistaken denial of a peremptory challenge is reversible error per se. Or they may conclude, as the Supreme Court of Illinois implicitly did here, that the improper seating of a competent and unbiased juror does not convert the jury into an ultra vires tribunal; therefore the error could rank as harmless under state law.

In sum, Rivera received precisely what due process required: a fair trial before an impartial and properly instructed jury, which found him guilty of every element of the charged offense.

Rivera, 556 U.S. at 162-63.

We initially conclude the Defendant is not entitled to relief based on the trial court's shortening of the time period for counsel to voir dire the prospective jurors because both the State and the defense were given the opportunity to repetitively and thoroughly question the venire over a period of approximately eight hours. Whether the trial court's action in denying the Defendant the right to exercise her last two peremptory challenges entitles her to relief, requires more discussion. Howell and Rivera make it clear that the Defendant is not entitled to relief regarding the denial of the peremptory challenges under the Due Process Clause of the Fourteenth Amendment. Moreover, while we agree that the trial court's failure to allow the Defendant to exercise her last two peremptory challenges constitutes error under state law, on this record, we are unable to conclude that it amounts to reversible error.

In reaching this decision, we note that the transcript from voir dire and jury selection does not provide enough details for this court to determine how the trial court was replacing jurors that were struck peremptorily, whether the court was allowing the parties to "back-strike" jurors, how the composition of the individuals in the jury box changed throughout the selection process, or how many individuals seated in the jury box were agreed to by both sides before jury selection was brought to a close. Most importantly, we are without the benefit of an offer of proof by the Defendant showing how she was impacted by the trial courts action in denying her remaining two peremptory challenges. From what we can glean from the sparse record on this issue, the Defendant was given an opportunity to challenge the all prospective jurors in the jury box, but she declined to do so, choosing instead to make an invalid strike to one of the prospective jurors not sitting in the jury box. Although the Defendant argues that the manner of voir dire and jury selection was prejudicial, she has presented absolutely no evidence that the jurors that decided her case were not competent, unbiased, and impartial. At best, the Defendant's argument is a theoretical one, and she has failed to establish any actual prejudice. We certainly agree with the Defendant that the appropriate course would have been for the trial court to continue jury selection to the next

earliest opportunity. However, we also recognize that the trial court was dealing with a rapidly changing, extremely difficult set of circumstances. Because the Defendant has failed to demonstrate that the error by the trial court in denying her remaining two peremptory strikes affected the jury's verdict or prejudiced her trial, she is not entitled to relief.

**III. Ex Parte Communications.** The Defendant argues that she is entitled to a new trial based on the appearance of impropriety created by an ex parte communication between two senior attorneys in the district attorney's office and the trial judge. She contends that the trial judge erred in denying the defense's request for a mistrial immediately after this ex parte communication occurred and that the successor trial judge erred in not granting a new trial based upon the appearance of impropriety created by this ex parte communication. The Defendant claims that regardless of the substance of this ex parte communication, the trial judge's response in telling her secretary to shut the door, thereby barring defense counsel's entrance during the ex parte communication, gave rise to an appearance of impropriety that tainted the remainder of the trial proceedings. She notes that the trial judge, while asserting that she had fairly and competently presided at trial, recused herself prior to hearing the motion for new trial based on the appearance of impropriety stemming from the ex parte communication and asserts that the judge's recusal makes a new trial necessary because she was deprived of her right to an impartial tribunal. We conclude that the Defendant is not entitled to a new trial on this issue.

At the beginning of the second day of trial, outside the presence of the jury, defense counsel asked to address the court regarding an incident that had occurred earlier that morning. He said that two senior members of the district attorney's office, who were not assigned to the Defendant's case, had gone with the trial judge into her chambers. At the time, he decided that if these two assistant district attorneys were discussing the Defendant's case with the trial judge, he and co-counsel wanted to be a part of it, and both defense attorneys went to the judge's chambers and asked the judge's secretary if they could be included in the conversation. Defense counsel said he later learned that the two senior attorneys with the district attorney's office were discussing whether the judge had committed reversible error in cutting off jury selection in the Defendant's case the previous night. He then made a motion for a mistrial, arguing that this ex parte communication compromised the judge's appearance of impartiality.

After defense counsel made his motion for a mistrial, the presiding judge described the incident, stating:

> I was trying to get the attorneys in here to get this trial started and [one member of the district attorney's office] came up to talk to me and said can I ask you about something, can I talk to you about something and I said sure.

-29-

And she and [another member of the district attorney's office] came back there and I said, you know, can we talk here and she said no, it might be better to talk in your office. So I had no idea what they wanted to talk about.

And frankly she started talking to me that I may have committed reversible error. And, you know, that I–[she] suggest[ed] I do something to change it and I said no. And then my secretary said [the defense attorneys] want to come in, I said close the door.

I had no idea that's what they wanted to talk about but I let them know I did not think I had done anything that would rise to a level of reversible error and that I was going to give you an opportunity to bring this up this morning and we would air it out. But this is not some huge thing. This could have been handled in about five minutes. Now it's been blown all out of proportion and it's just ridiculous.

After the trial court, the State, and defense counsel discussed the details of what had happened during jury selection the previous night, the court denied the defense's motion for a mistrial.

On February 10, 2012, the Defendant, after her trial and sentencing, filed a motion requesting the trial judge to recuse herself "from hearing and deciding any further proceedings in this cause." At the February 16, 2012 hearing, defense counsel argued that recusal was required because of the ex parte communication made by two senior members of the district attorney's office to the trial judge the morning after jury selection. The trial judge again explained the details of the incident: "[W]e left . . . the courtroom . . . and entered my office. [Defense counsel] followed right after, talked to my secretary–you asked to enter the room. I said, 'Close the door.' And within probably twenty or thirty seconds, we exited the room." The judge stated that when the two prosecutors approached her in court, she asked if they could talk in the courtroom, and they stated that they needed to talk to her in chambers. The judge reiterated that she had "no idea" why the two attorneys wanted to talk to her and believed that there might have been an issue about one of the assistant district attorneys in her courtroom. She said that once they got to her chambers, the two attorneys with the district attorney's office informed her that they believed she had committed reversible error by not giving the Defendant the chance to use her final peremptory strikes. The judge said she replied, "Let's just get out there and put this all on the record."

At the hearing on the motion to recuse, defense counsel argued that a person looking at this incident objectively would believe that there was an appearance of impropriety and

that this incident affected the judge's ability to rule on the motion for new trial. The judge reminded defense counsel that the comments made by the attorneys in chambers were helpful to the Defendant because they were telling her to "[s]tart this trial over, you've already hurt the defendant by not giving them that final couple of opportunities for jury strikes." The trial judge also stated that she was struggling with the decision of whether to recuse herself in this case:

> I take this very seriously. I'm embarrassed. I don't know if I should recuse myself or not because what's going to happen is another judge is going to get this [case]. They don't know the ins and out of it like I do; and that's really too bad. That's really too bad because I think this issue about the jurors, maybe I did–maybe it is wrong. I think the trial was fair. I don't believe I committed reversible error at all during the trial, but, you know, thinking back on it, maybe I–you know, with the weather and with the elderly juror, maybe I did make a mistake. Maybe some other judge or the appellate courts will look at it differently; and because of that, this family is going to have to relive this trial. So, I–you know, I really–I just wish [the two senior members of the district attorney's office] did not come by that day[.]

The judge added that she had not treated the Defendant "in anyway unfairly" during the trial based on this incident. The trial judge further explained the circumstances surrounding the ex parte communication:

> I don't think [the defense attorneys] had quite come in yet; and [the two senior attorneys with the district attorney's office] said, you know, "We need to talk to you about something." And I said, "Well, go ahead. You know, what's up?" They said, "Well, we really need to do it in private." I said, "Well okay. I'm trying to get this . . . jury trial started." So, we went back there; and they started saying, "So, we heard you kept the defense from exercising peremptory challenges yesterday; and you know, we've been talking about it downstairs, and we think you committed reversible error." And I said, "I can't believe you guys are down there talking about me like that." You know, I don't remember exactly what I said, but I said, "I did not commit reversible error." And at that time, my secretary said, "[Defense counsel] are here." And I said, "Close the door." And I said, "We're going to go out there, and we're going to put all this on the record. Okay. You've got a problem with it–he's got a problem with it–go out there–make your objections– I don't care," which is the typical way I react when something irritates me.

-31-

So, I got out of there as quickly as I could and noticed those two state's attorneys had taken off. [Defense counsel] wasn't happy–I wasn't happy–I stated what had happened as clearly as I could on the record. That's that. [Defense counsel] made his argument about why he thought a mistrial was required at that point and says he made a motion for me to recuse myself at that point. I don't remember that. . . . And I denied the mistrial and said, "We're going to get this trial started[.]"

Defense counsel stated that if the trial judge recused herself, as the Defendant had requested, it questioned whether another judge could decide the issues in the motion for a new trial given that he or she had not heard the witnesses or considered all the proof. The trial judge asserted that she had not been "anything but fair and impartial." Ultimately, however, she recused herself because of "an appearance of impropriety because of what two members of the district attorney's office did . . . ."

Subsequently, the case was reassigned to a successor judge. In the order denying the Defendant's motions for new trial, the successor judge held that the trial judge did not err in refusing to grant a mistrial based on the ex parte communication:

This court does not find the trial court abused its discretion in refusing to grant a mistrial based upon the unsolicited comments of two attorneys in the District Attorney General's Office who were otherwise unrelated to the case. In the instant case, the trial court was ambushed by [a senior assistant district attorney and the deputy district attorney]. Given that the attorneys were not associated with the case and given [the deputy district attorney's] position in the Office, this court finds the assertion by the trial court that she believed the attorneys wished to speak to her about an unrelated matter particularly credible and wholly reasonable. However, unbeknownst to the trial court, the attorneys' purpose was to address the court about an alleged error on behalf of the court and to suggest corrective action be taken. The trial court immediately cut the attorneys short and instructed them that she did not wish to hear from them further and informed them that she intended to put the substance of their comments on the record. The trial court took no remedial action based upon [the two attorneys'] comments. Based upon the court's comments at a post-trial hearing, it appears the interaction only last[ed] a few minutes. The court promptly alerted the parties as to the substance of the conversation and allowed the defense to make their objections for the record.

The court does not find that the comments [of the two attorneys with the district attorney's office] affected the outcome of defendant's trial or the

actions of the trial court on ruling upon the issues that arose during the trial or conducting the trial. Moreover, this court does not find the defendant was denied a fair trial based upon the attorneys['] interactions with the trial court. There was simply no manifest necessity that resulted as a consequence to the above described interaction that required the granting of a mistrial.

The successor judge also held that the presiding judge properly determined that the ex parte communication did not warrant a new trial: "The [trial] court . . . determined that, although the court improperly discussed a ruling with the members of the District Attorney General's office, it did not do so purposefully and a new trial was not warranted based upon this communication. This court declines to address these issues further."

We agree with the successor judge's finding that the trial judge did not abuse her discretion in denying the Defendant's request for a mistrial. The grant or denial of a motion for a mistrial rests within the sound discretion of the trial court. State v. Johnson, 401 S.W.3d 1, 21 (Tenn. 2013) (citing State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004)). A trial court should declare a mistrial "only upon a showing of manifest necessity." Robinson, 146 S.W.3d at 494 (citing State v. Saylor, 117 S.W.3d 239, 250-51 (Tenn. 2003)). A mistrial corrects damage done to the judicial process when an event occurs that precludes an impartial verdict. State v. Reid, 164 S.W.3d 286, 341-42 (Tenn. 2005) (citing State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). This court will not reverse the trial court's denial of a motion for mistrial "absent a clear showing that the trial court abused its discretion." Robinson, 146 S.W.3d at 494 (citing State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002)). The party seeking a mistrial has the burden of establishing the necessity of a mistrial. Reid, 164 S.W.3d at 342 (citing Williams, 929 S.W.2d at 388).

Here, the trial judge put the entirety of the ex parte communication on the record and gave defense counsel the opportunity to respond and make any motion it felt was proper under the circumstances. The presiding judge also indicated that the incident was "not some huge thing" and could have been handled on the record in the presence of both parties "in about five minutes." After reviewing the record, we conclude that the trial court did not abuse its discretion in denying the motion for a mistrial.

We also agree with the successor judge that the ex parte communication did not warrant a new trial in this case. Although the trial judge ultimately recused herself based on the appearance of impropriety related to this ex parte communication, we conclude that the trial judge's recusal was unnecessary. A judge's duty to recuse stems from Article VI, section 11 of the Tennessee Constitution, which states that "[n]o Judge of the Supreme or Inferior Courts shall preside on the trial of any cause in the event of which he may be interested. . . ." As the Tennessee Supreme Court noted, "[t]he purpose of Article 6, § 11 of

-33-

our Constitution is to insure every litigant the cold neutrality of an impartial court." Leighton v. Henderson, 414 S.W.2d 419, 421 (Tenn. 1967). Similarly, Tennessee Code Annotated section 17-2-101 provides that "[n]o judge or chancellor shall be competent, except by consent of all parties, to sit . . . [w]here the judge or chancellor is interested in the event of any cause[.]" The Tennessee Supreme Court has noted that "the preservation of the public's confidence in judicial neutrality requires not only that the judge be impartial in fact, but also that the judge be perceived to be impartial." Kinard v. Kinard, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998) (citing Offutt v. United States, 348 U.S. 11, 14 (1954); In re Cameron, 151 S.W. 64, 76 (1912)).

"Whether a judge should recuse herself or himself from a legal proceeding rests within the sound discretion of the judge." State v. Cannon, 254 S.W.3d 287, 307 (Tenn. 2008) (citing State v. Reid, 213 S.W.3d 792, 815 (Tenn. 2006); Davis v. Liberty Mut. Ins. Co., 38 S.W.3d 560, 564 (Tenn. 2001)). Recusal[4] is warranted "'when the judge has any doubt as to his or her ability to preside impartially in the case or when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" Smith v. State, 357 S.W.3d 322, 341 (Tenn. 2011) (quoting Bean v. Bailey, 280 S.W.3d 798, 805 (Tenn. 2009)) (emphasis added). The standard, however, is objective: "even if a judge subjectively believes he or she can be fair and impartial, the judge should disqualify himself or herself upon request whenever the judge's impartiality might be reasonably questioned because the appearance of bias is as injurious to the integrity of the judicial system as actual bias." Id. (citations and internal quotation marks omitted).

We note that "[n]ot every bias, partiality, or prejudice merits recusal." Alley v. State, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994). "To disqualify, prejudice must be of a personal character, directed at the litigant, 'must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from . . . participation in the case.'" Id. (citations omitted). Moreover, a court's adverse rulings are typically insufficient grounds to prove bias. Id. (citing State v. Jimmy D. Dillingham, No. 03C01-9110-CR-319, 1993 WL 22155, at *5 (Tenn. Crim. App. Feb. 3, 1993)). "Rulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification." Id. (citations omitted).

---

[4] Tennessee Supreme Court Rule 10B, which establishes the procedures for filing motions for disqualification or recusal of a trial judge and for appeals from the denial of said motions, is not applicable to this case because because the motion for recusal in this case was filed on February 10, 2012, several months prior to the effective date of Rule 10B. See Sup. Ct. R. 10B, Complier's Notes (2012).

One of the rules in effect at the time that the Defendant's filed her motion to recuse was Tennessee Supreme Court Rule 10, Canon 2,[5] which provided in part:

CANON 2. A Judge Shall Avoid Impropriety and the Appearance of Impropriety in All of the Judges's Activities

A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge shall not allow family, social, political, or other relationships to influence the judge's judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness.

Sup. Ct. R. 10, Canon 2 (2011).

In addition, Tennessee Supreme Court Rule 10, Canon 3(B)(7)(a)[6] was also in effect, which provided:

CANON 3. A Judge Shall Perform the Duties of Judicial Office Impartially and Diligently

B. Adjudicative Responsibilities

(7) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that:

---

[5] This Rule was effective until July 1, 2012, when it was replaced by Tennessee Supreme Court Rule 10, Canon 1, Rule 1.2; Canon 2, Rule 2.4; and Canon 3, Rule 3.6 (2012).

[6] This Rule was effective until July 1, 2012, when it was replaced by Tennessee Supreme Court Rule 10, Canon 2, Rules 2.6 and 2.9 (2012).

(a) Where circumstances require, ex parte communications for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized; provided:

(i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication; and

(ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.

Sup. Ct. R. 10, Canon 3(B)(7)(a) (2011).

Finally, Tennessee Supreme Court Rule 10, Canon 3(E)(1)[7] was also in effect, which provided:

**E. Disqualification.**

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]

Sup. Ct. R. 10, Canon 3(E)(1) (2011).

The record fully supports the successor court's denial of the Defendant's motions for new trial on this issue. Immediately after the trial judge placed the details of the ex parte communication on the record, the Defendant requested a mistrial but never asked the trial judge to recuse herself. In fact, the defense asked the trial judge to recuse herself for the first time at the Defendant's sentencing hearing, and the defense did not file a formal motion for recusal until February 10, 2012, when it filed its motion for new trial.

---

[7] This Rule was effective until July 1, 2012, when it was replaced by Tennessee Supreme Court Rule 10, Canon 2, Rule 2.11 (2012).

Although the presiding judge recused herself based on an "appearance of impropriety"[8] prior to ruling on the Defendant's motion for new trial, we conclude that the trial judge's recusal, which was done out of an abundance of caution, was unnecessary because a person of ordinary prudence in the judge's position, knowing all the facts known to the judge, would not find a reasonable basis for questioning the judge's impartiality. The record clearly shows that as soon as the trial judge realized that the two senior attorneys with the district attorney's office were informing her that she had committed reversible error during jury selection in the Defendant's case, she immediately stopped the discussion and placed the entirety of what happened on the record. There is absolutely nothing in the record indicating that the trial court was partial or biased against the Defendant. Accordingly, the Defendant is not entitled to a new trial on this issue.

**IV. Thirteenth Juror.** The Defendant argues she is entitled to a new trial because the successor judge was unable to act as the thirteenth juror given that he was not present at trial to assess the credibility of each witness's testimony. She also claims that the presiding judge could not properly serve as the thirteenth juror because she recused herself after determining there was at least an "appearance of impropriety." Because neither the presiding judge nor the successor judge was able to serve in the role of thirteenth juror, the Defendant asserts that her conviction should be reversed. We conclude that because the presiding judge properly fulfilled her duty as the thirteenth juror in approving the jury's verdict, it was unnecessary for the successor judge to act as the thirteenth juror in this case.

Tennessee Rule of Criminal Procedure 33(d) provides: "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This court has held that Rule 33(d) "is the modern equivalent to the 'thirteenth juror rule,' whereby the trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict." State v. Blanton, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). The court's fulfillment of its duty as thirteenth juror "is a necessary prerequisite to imposition of a valid judgment." State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995) (citing Messer v. State, 385 S.W.2d 98, 101 (Tenn. 1964); State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)). When acting as the thirteenth juror, the trial judge is not required to make an explicit statement on the record. Id. Instead, the reviewing court may presume that the trial judge has fulfilled its duty as the thirteenth juror when it overrules a motion for new trial. Id. However, "when a trial court chooses to comment on the record about its thirteenth juror determination, the ruling should be clear and unequivocal." State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995). If the reviewing court

---

[8] "The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality, and competence is impaired." Sup. Ct. R. 10, Canon 2, Commentary (2011).

concludes that the trial court failed to fulfill its duty as the thirteenth juror, the appropriate remedy is to grant a new trial. Id.

Immediately after hearing the jury's verdict, the presiding judge did not expressly approve the verdict as the thirteenth juror. However, during the hearing on the Defendant's motion to recuse, the presiding judge, prior to recusing herself from further proceedings, explicitly ruled as the thirteenth juror, stating: "First, let me state, as thirteenth juror, I do find that there was sufficient evidence in the record to support the finding of murder in the second degree [for] [the Defendant]. I do agree with the jury verdict."

Following the presiding judge's recusal, a successor judge was appointed pursuant to Tennessee Rule of Criminal Procedure 25(b), which states:

**After Verdict of Guilt.**

(1) In General. After a verdict of guilty, any judge regularly presiding in or who is assigned to a court may complete the court's duties if the judge before whom the trial began cannot proceed because of absence, death, sickness, or other disability.

(2) Granting a New Trial. The successor judge may grant a new trial when that judge concludes that he or she cannot perform those duties because of the failure to preside at the trial or for any other reason.

Tenn. R. Crim. P. 25(b).

The successor judge, in denying the motion for new trial, held that Rule 25(b)(2) did not apply because "the original trial judge made a proper thirteenth juror finding prior to recusal." We agree with the successor judge's holding. Here, the Defendant cites State v. Biggs, 218 S.W.3d 643, 655 (Tenn. Crim. App. 2006), to support her claim that the successor judge was unable to act as the thirteenth juror because he was unable to assess the credibility of each witness's testimony. However, the Defendant's reliance on Biggs is misplaced because the presiding judge in this case properly fulfilled her duty as the thirteenth juror, thereby eliminating the need for the successor judge to act in that capacity. The record shows that the presiding judge agreed with the jury's verdict after weighing the evidence presented at the Defendant's trial. The judge fulfilled her duty as the thirteenth juror and then recused herself. See State v. James Scott, No. W2006-02519-CCA-R3-CD, 2008 WL 1700219, at *6 (Tenn. Crim. App. Apr. 7, 2008) (holding that the trial court abused its discretion when it ruled on the defendant's motion for new trial after recusing itself from sentencing the defendant). Earlier in this opinion, we held that the presiding judge's recusal based on the

"appearance of impropriety" was unnecessary because there was no proof that the judge was biased. Accordingly, we conclude that the presiding judge was not precluded from acting as the thirteenth juror in this case and that she properly fulfilled her duty in that role.

**V. Admission of Lay Opinion Testimony.** The Defendant argues that the trial court erred in admitting lay opinion testimony from four police officers about the crime scene appearing "staged." She also contends that the trial court erred in admitting lay testimony from three other State's witnesses regarding the effects of steroid use.

**A. "Staged" Appearance of Crime Scene.** The Defendant argues that the trial court erred in admitting the testimony from four police officers that the crime scene appeared "staged." She avers that none of these officers were qualified as experts in the field of crime scene reconstruction. She also asserts that these officers testified about the "staged" nature of the crime scene even though none of them documented their observations in a report or communicated their observations to their superior officers. The Defendant also contends that the probative value of this evidence was outweighed by its prejudicial effect and that this evidence confused and misled the jury. We conclude that the trial court properly admitted this testimony.

Adam Merrit, an officer with fourteen years of experience with the Memphis Police Department, testified that he responded to a call of "[s]hots fired" at the Defendant's apartment. When he walked inside the apartment, he noticed, based on his experience in responding to "[h]undreds if not thousands" of crime scenes, that the chairs in the apartment looked as if they had been overturned and that nothing on the floor was broken:

> [I]n the past and the scenes I've handled, knowing when you have a scene of disturbance, where there's items that are laying [sic] on the floor that [were supposedly] thrown on the floor, you're going to have something that's broke[n] or something that is damaged. While I was on the scene looking in this area I did not see anything actually damaged.

Officer Merritt stated that the significance of his observations was that "the items were probably placed there." The defense objected to this testimony on the basis that Officer Merritt had not been qualified to testify as an expert. The court responded, "Well I don't think we need an expert to testify about a crime scene when you've got an officer that's handled this many scenes. So I will allow him to give the answer. And obviously you will be able to cross-examine him." On cross-examination, Officer Merritt stated that he told Officer Mize about his observations at the crime scene but did not document his observations in a report because he was not responsible for making the crime scene report. He said he never spoke to Sergeant Webb about his observations. Officer Merritt acknowledged that

-39-

he never entered the bedroom or the attached bathroom where the victim was found. He also acknowledged that he had never received the training that crime scene investigators receive.

Michael Brown, a sergeant with the Memphis Police Department's homicide bureau, testified that the inside of the Defendant's apartment did not look like "a life and death struggle had occurred before the shooting." Based on his twenty-three years of experience as a police officer and his observations of "over two hundred" crime scenes, Sergeant Brown stated his opinion that at least some parts of the crime scene had been "staged." The defense objected, asserting that the "reliability" of Sergeant Brown's conclusion was "in question." The court stated, "Well, I think he's certainly got a lot of experience. But I don't think he's really set out exactly what[] the scene [looked like] other than [the Defendant] sitting on the couch." When the State asked Sergeant Brown about the specific things in the living room that made him believe the crime scene was staged, he replied that "the chairs [had] been turned over all in the same direction and [had been] laid down" rather than "thrown around." He noted that none of the chairs were damaged. In addition, he said that although the Defendant claimed that the victim had choked her on the bed, the comforter was still on the bed. On cross-examination, Sergeant Brown admitted that he did not know how much strength the victim exerted to throw the chairs. He also admitted that he did not know how the chairs had hit the carpet. Sergeant Brown acknowledged that he noticed a hole in the wall but asserted that the Defendant never told police the victim put a hole in the wall just prior to the shooting.

J.D. Downs, an officer with the Memphis Police Department with thirty-two years of experience, testified that he was the first officer to respond to the crime scene. When he entered the Defendant's apartment, he noted that some of the furniture and furnishings had either been knocked over or pushed down. Based on his experience, Officer Downs concluded that the scene did not look like a real fight had occurred and instead looked as if it had been "staged." On cross-examination, when he was asked whether the State believed that the crime scene was staged, Officer Downs stated that he reached his conclusion that the scene appeared to be "staged" within the first ten minutes of arriving on the scene. However, he acknowledged that he did not tell the homicide unit about his belief that the scene was staged.

Jeffrey Garey, an officer with sixteen years of experience who was currently assigned to the crime scene investigation unit of the Memphis Police Department, was declared an expert in crime scene investigation. Officer Garey testified that he took photographs and collected and preserved evidence from the scene. He opined that the location and appearance of the victim's body, the placement of items in the apartment, and the clothes the Defendant was wearing looked as if they had been "staged or prearranged." Officer Garey stated that

the disarray in the front of the apartment seemed to have nothing to do with the bathroom where the victim was found. On cross-examination, Officer Garey acknowledged that he did not mention anything about the apartment looking "staged" in his report. He also admitted that he did not know if the victim knocked over the items in the living room and had no evidence to establish that the Defendant staged these items. On redirect examination, Officer Garey noted that "[t]he one chair from the dining room ensemble and the two bar stool type chairs appeared to have been knocked over from their original position, not thrown in a fit of rage." He said that none of these chairs were damaged.

Initially, we note that the Defendant arguably waived this issue regarding the testimony from Officer Downs and Officer Garey because she did not make contemporaneous objections to their testimony at trial. See Tenn. R. App. P 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. R. Evid. 103(a)(1) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence). However, because the Defendant objected to similar testimony from Officer Merritt and Sergeant Brown, we will review this issue as to all four officers.

The Defendant argues that the trial court erred in admitting the testimony because none of these officers were qualified as experts in the field of crime scene reconstruction. However, lay witnesses may testify to opinions or inferences which are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). This rule is not without its limitations:

> Generally, non-expert witnesses must confine their testimony to a narration of the facts based on first-hand knowledge and avoid stating mere personal opinions or their conclusions or opinions regarding the facts about which they have testified. Blackburn v. Murphy, 737 S.W.2d 529, 531 (Tenn. 1987). This rule preserves the province of the jury as the fact-finding body designated to draw such conclusions as the facts warrant. Id. An exception to this general rule exists where testimony in an opinion form describes the witness's observations in the only way in which they can be clearly described, id. at 532, such as testimony that a footprint in snow looked like someone had slipped, National Life & Accident v. Follett, 168 Tenn. 647, 80 S.W.2d 92 (1935), or that a substance appeared to be blood. State v. Mabon, 648 S.W.2d 271, 274 (Tenn. Crim. App. 1982).

State v. Brown, 836 S.W.2d 530, 550 (Tenn. 1992).

It is well-established that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008) (citing State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); and Harris, 839 S.W.2d at 73). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or [reaches] a decision which is illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)).

In denying the motion for new trial, the successor court concluded that the trial court did not err in admitting the officers' testimony about the "staged" appearance of the crime scene:

> The court finds that the observations of the officers regarding their impression that the scene had been "staged" were properly admitted under Tennessee Rule of Evidence 701. The testimony of the witnesses was rationally based on their perceptions of scene as they observed it in the minutes or immediate hours after the murder. Additionally, their testimony was based on their many years of experience as officers responding to crime scenes. Moreover, their testimony was helpful in aiding the jury in determining whether the assertions of the defendant could be corroborated by the evidence. Thus, the defendant is not entitled to relief based upon this claim.

We conclude that the record fully supports the successor court's conclusion. The opinions of Officer Merritt, Sergeant Brown, and Officer Downs regarding the "staged" nature of the crime scene were rationally based on their observations and were helpful to the determination of a fact in issue, namely whether the Defendant's version of the events leading up to the victim's death was credible. The record shows that the defense was allowed to extensively cross-examine these witnesses about whether their opinions were supported by a proper foundation. Moreover, the officers' opinions that the crime scene looked "staged" were most closely akin to the lay opinion testimony deemed admissible in Follett and Mabon because the officers described the appearance of the crime scene in a way that could not be captured in photographs or established in an alternative way. See Follett, 80 S.W.2d at 98 (holding that witnesses' testimony that they saw a footprint in the snow that looked as if someone had slipped was admissible as lay opinion testimony because it related what the witnesses had seen more easily and accurately by stating the conclusion rather than by attempting to detail the facts supporting the conclusion); Mabon, 648 S.W.2d at 274 (stating that officers' testimony about observing a substance that appeared to be blood at the crime scene was admissible because the officers were merely describing what they perceived

through their senses "'in the only way that such perceptions could be clearly described'" (quoting Schweizer v. State, 399 S.W.2d 743, 575 (Tenn. 1966)). In this case, the officers' lay opinion testimony did not require specialized skill or expertise because the concept of "staging" a crime scene could be easily understood by the jury. Brown, 836 S.W.2d at 550. For these reasons, we conclude that the trial court did not abuse its discretion in allowing this testimony under Rule 701.

In addition, because Officer Garey was qualified as an expert pursuant to Tennessee Rule of Evidence 702, we conclude that the trial court did not abuse its discretion in allowing him to testify that the location and appearance of the victim's body, the placement of items in the apartment, and the clothes the Defendant was wearing looked as if they had been "staged or prearranged." Officer Garey's testimony also assisted the trier of fact in determining whether the Defendant's claim of self-defense was credible and was, therefore, admissible.

Finally, the Defendant argues that the probative value of the officers' opinion testimony was outweighed by the danger of unfair prejudice and that this testimony confused the issues and mislead the jury. Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror." State v. Young, 196 S.W.3d 85, 106 (Tenn. 2006) (citations and internal quotation marks omitted). Although the Defendant never specifically objected to the admission of this testimony under Rule 403, we conclude that the probative value of this evidence, which rebutted the Defendant's theory of self-defense, was not substantially outweighed by the danger of unfair prejudice. We also conclude that this testimony did not confuse the issues or mislead the jury but rather assisted the jury in determining whether the Defendant's version of the events was credible.

**B. Effects of Steroid Use.** The Defendant also argues that the trial court abused its discretion in allowing three of the State's witnesses to testify about how anabolic steroids affect the mood and behavior of the individuals who use them. She asserts that this

testimony did not satisfy the requirements in Tennessee Rule of Evidence 701 because most of the testimony was unrelated to the victim's use of steroids and exceeded the scope of the witnesses' competency. Specifically, she argues that the trial court should not have admitted John Simmons's testimony that the victim had a consistent mood because he did not have personal knowledge of the victim's alleged steroid use. In addition, she asserts that the trial court should have excluded Officer Greer's testimony about the effect of adrenaline on testosterone production because it was unrelated to the victim's alleged steroid usage and was hearsay. Finally, she asserts that Timothy Maness's testimony regarding the affect of steroids on the victim's behavior should have been excluded because Mr. Maness was unable to say with any degree of medical certainty that the victim's steroid use did not alter his behavior toward other people. We conclude that the admission of this evidence did not constitute reversible error.

When the State asked John Simmons about what he knew about steroids, the defense objected that the witness was not qualified to testify about steroids and that the foundation had not been laid for this testimony. The court gave the State the opportunity to lay a foundation. Mr. Simmons subsequently testified that approximately eighty percent of the men in his unit in the Air Force used steroids. At that point, the defense again objected, arguing that Mr. Simmons was not qualified to give this testimony and that a voir dire hearing was necessary to cover his qualifications, training, and experience. Defense counsel argued that the State could ask Mr. Simmons if he noticed any anger issues with the victim but that Mr. Simmons should not be allowed to testify about his general knowledge of steroids because he was not competent to give this testimony and because the testimony was irrelevant. Defense counsel also asserted that only a toxicologist or pathologist or someone with scientific medical expertise was competent to testify about the effects of steroid use. The court overruled the objection on the basis that the defense could present their toxicologist, and the jury could weigh that expert's testimony against Mr. Simmons's testimony. It also stated that it believed Mr. Simmons could make general observations about the behavior of individuals who use steroids.

When Mr. Simmons's testimony resumed, he stated that he spent a lot of time with the men in his unit who used steroids and regularly worked out with them. Mr. Simmons opined that most of the men using steroids were "perfectly normal." However, he acknowledged that two of men in his unit "tended to get a little more aggressive and one had some decreased sexual problems." Mr. Simmons stated that he had never talked to the victim about steroids and had never noticed any aggressive behavior from the victim. He stated that the victim's mood was "very consistent." On cross-examination, Mr. Simmons acknowledged that he had never taken steroids. He admitted that he was not sure where the men in his unit were getting the steroids they used, had never seen the men in his unit injecting the steroids, and did not know the amount or type of steroids the men were using.

The State also asked Officer Greer if he was familiar with steroids or hormone replacement therapy, and defense counsel objected on the basis that Officer Greer did not have the qualifications and competence to testify about that issue. Defense counsel also argued that a proper foundation had not been laid and that this testimony was irrelevant. The court stated that it wanted to hear what Officer Greer had to say on the issue. Officer Greer then testified that he had received a shot of testosterone from his doctor every seven to ten days for the last two years. He stated that he and the victim had talked about going to a doctor for steroids so that the doctor could check your steroid levels. The defense again objected, arguing that Officer Greer was not an expert and that his testimony was hearsay. The court stated that Greer could testify about his personal experiences. Officer Greer said he had never talked directly to the victim about whether the victim used steroids, but he had never observed the victim having any anger problems other than common frustrations with work. On cross-examination, Officer Greer said he had never experienced "[ster]roid rage" because he had been under the care of a doctor for his steroid treatments. He acknowledged that he knew the victim used steroids because he had heard the victim and Timothy Maness discussing their steroid use, although the victim never admitted to him that he used steroids because he was a police officer. On redirect examination, when the State asked Officer Greer how many people he knew on steroids, the defense objected, arguing that Officer Greer's testimony about people who were prescribed steroids by a doctor was irrelevant. The court ruled that this testimony was relevant because the victim was not prescribed the steroids he was using. Officer Greer went on to testify that "[m]any" of the officers he worked with were prescribed steroids through a clinic.

Timothy Maness testified that he used steroids with the victim. He said the victim was "very particular" about the steroids he used and typically used Stanozolol, which contained four types of testosterone, and then took Winstrol tablets for six weeks after taking the Stanozolol. Mr. Maness said that the victim would not use more than two twelve-week cycles of these drugs a year. Although he never saw the victim physically inject the shot, Mr. Maness said that he and the victim were usually taking the same cycle at the same time. He said he never observed the victim being more aggressive or angry while on the steroids. On cross-examination, Mr. Maness said that he knew a lot of people who used steroids but had never seen anyone exhibiting "[ster]roid rage."

Although the successor court did not specifically rule on this issue, it found that "the limited trial court errors" did not necessitate granting a new trial. Initially, we note that defense counsel never objected that Mr. Maness was incompetent to testify about the behavioral effects of steroids. However, because the defense made objections on the record regarding Mr. Simmons's and Officer's Greer's competency to give this testimony, we will review this issue. We conclude that although the testimony from Mr. Simmons, Officer Greer, and Mr. Maness about their personal observations about the victim's behavior was

admissible, their testimony about the general effects of steroid use should not have been admitted because it called for specialized skill or expertise. Brown, 836 S.W.2d at 550 (concluding that non-expert testimony from a paramedic regarding his opinion as to the source of the victim's bruised face was not admissible because it called for "specialized skill or expertise"). None of these witnesses were qualified to give expert opinion testimony about how the use of steroids affects a person's mood and behavior. See Tenn. R. Evid. 702, 703. However, the admission of this testimony was not reversible error because the defense was able to effectively challenge this testimony on cross-examination and was able to present expert testimony regarding the effects of steroid use from Dr. Robert, an expert in the area of toxicology. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Accordingly, the Defendant is not entitled to relief on this issue.

**VI. Admission of Character Evidence and Evidence of Other Crimes, Wrongs, or Acts.** The Defendant argues that the trial court erred in admitting evidence of her character and her prior bad acts without making the appropriate determinations under Rule 404(a) and (b). Specifically, she challenges the admission of certain testimony from Diane Welch, Timothy Maness, Deanne Dixon, Ashley Montgomery, and L.T. We conclude that the Defendant is not entitled to relief on this issue.

**A. Diane Welch.** The Defendant argues that the trial court erred in admitting Ms. Welch's testimony about the Defendant's jealousy and financial problems because this evidence was irrelevant to determining whether she acted in self-defense. She also argues that the prejudicial nature of Ms. Welch's testimony about these prior acts outweighed the probative value of the evidence.

At trial, Ms. Welch stated her opinion that the Defendant was a very jealous girlfriend and wife because the Defendant would get angry if other women paid attention to the victim. Defense counsel objected, claiming that the State had failed to lay a foundation for how she knew of the Defendant's jealousy and that the evidence was irrelevant. The court agreed that additional foundational questions were appropriate. Ms. Welch then stated that she had seen the Defendant get angry if the victim wore cologne to work. She also saw the Defendant grab another woman by the head and push her after the woman tapped the victim on the back. Ms. Welch said that when the Defendant and the victim were approximately twenty-four years old, the Defendant suddenly appeared when the victim and his date returned home, and the victim had to restrain the Defendant so that the other woman could get into her car to leave. The defense again objected, and during the ensuing bench conference, the defense argued that this evidence was "extremely prejudicial," that there was no "predicate laid for

this being clear and convincing" and that this evidence was irrelevant. The court responded that defense counsel had been the "one who wanted [the State] to lay a foundation for why Ms. Welch was saying that your client was jealous." The court also noted this testimony indicated that the Defendant was "obsessed with . . . her eventual husband." Defense counsel stated that this was why he wanted "some of this to occur[] outside the presence [of the jury] because . . . the Court needs to [determine whether] these things in fact happened. If it just doesn't seem plausible, it's not clear and convincing, why does it come in?" The court said that it "comes in the same way that your evidence comes in about [the victim's] anger issues, about his controlling issues that you're going to want to put in about how abusive he was." The court also stated that defense counsel was going to get the opportunity to cross-examine Ms. Welch.

On cross-examination, defense counsel elicited testimony from Ms. Welch that she and the Defendant were not close when Brittany graduated from high school because Brittany's school tuition had not been paid, which prevented Brittany from receiving her diploma or her high school transcript for college. Ms. Welch said that around that time, she and her husband had helped Brittany get a car after the car that the Defendant purchased for her was repossessed. They also helped pay Brittany's insurance on the new car because they discovered that the Defendant had not been paying for Brittany's car insurance.

On redirect-examination, Ms. Welch said that she first became aware that $14,000 had not been paid for Brittany's high school tuition after she graduated. She also noted that she had seen the Defendant sitting outside in her car and had observed her driving back and forth in front of her home when the victim lived with her. On recross-examination, Ms. Welch acknowledged that she never called the police to report that the Defendant was often outside her home.

In denying the Defendant's motions for new trial, the successor court held that Ms. Welch's testimony regarding the Defendant's prior acts was "properly admitted as evidence of the defendant's motive and intent." We agree. Initially, we note that the Defendant waived any challenge to the admission of the majority of this evidence because she either elicited the testimony from Ms. Welch herself or failed to make a contemporaneous objection. See Tenn. R. App. P. 36(a) (noting that relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error."); Tenn. R. Evid. 103(a)(1) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence); State v. Smith, 24 S.W.3d 274, 279-80 (Tenn. 2000) (concluding that a defendant's failure to object to otherwise inadmissible evidence renders the evidence admissible); State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (concluding that defendant's failure to make a contemporaneous objection to the admission

of evidence resulted in waiver of the issue on appeal). Specifically, the defense elicited testimony regarding Ms. Welch's payment of Brittany's outstanding tuition bill, the repossession of Brittany's car that was in the Defendant's name, Ms. Welch's purchase of a new car for Brittany, and the Defendant's failure to pay for Brittany's car insurance.

The only piece of evidence to which the Defendant did object was Ms. Welch's testimony about the Defendant suddenly appearing when the victim returned home with a date. While we acknowledge that defense counsel made a contemporaneous objection to this testimony, the record clearly shows that the State elicited this testimony after the defense objected that the State had failed to lay a proper foundation for Ms. Welch's opinion that the Defendant was a jealous girlfriend and wife. See Robinson, 146 S.W.3d at 493 ("[I]t is well-settled that a litigant 'will not be permitted to take advantage of errors which he himself committed, or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct.'" (quoting Norris v. Richards, 246 S.W.2d 81, 85 (Tenn. 1952)). Significantly, the defense never objected that Ms. Welch's opinion as to the Defendant's jealous nature was inadmissable as a part of the State's case-in-chief and does not assert this argument on appeal. See State v. Patterson, 593 S.W.2d 913, 917 (Tenn. 1979) (reiterating that the State may not elicit character or reputation testimony about the defendant during its case-in-chief and that the defendant must open the door to evidence of his character or reputation); State v. Alder, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) ("It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal.").

Regarding the Defendant's act of showing up at the end of the victim's date, the record shows that the defense did not specifically request a Rule 404(b) hearing about this particular act and did not ask the court to state on the record the existence of a material issue other than conduct conforming with a character trait, its ruling, and the reasons for admitting the evidence. See Tenn. R. Evid. 404(b)(1), (b)(2). At the time of the objection, the court noted that this evidence indicated that the Defendant was "obsessed with . . . her eventual husband." We conclude that Ms. Welch's testimony was particularly relevant and admissible in this case because it provided a motive for the Defendant to commit the offense, namely that she was obsessed with the victim who had decided to leave her. See Tenn. R. Evid. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait" but may "be admissible for other purposes."); State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004) (The term "other purposes" in Rule 404(b) has been defined to include motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation). We also conclude that the probative value of this evidence regarding the Defendant's motive outweighed the danger

of unfair prejudice. For these reasons, we conclude that the trial court properly admitted this evidence.

**B. Timothy Maness.** The Defendant also argues that the trial court erred in admitting Mr. Maness's testimony about her jealous nature and her inability to have and keep a job. Specifically, she argues that the State failed to establish a sufficient foundation before it allowed Mr. Maness to attack her character. She also asserts that her allegedly jealous nature as well as her employment issues were irrelevant to whether she acted in self-defense and served only to cast her in a negative light in front of the jury.

Mr. Maness testified that during the last six months of the victim's life, the Defendant "kept losing jobs," which irritated the victim because the Defendant "made good money." He said he would notice that the Defendant was home on the patio smoking a cigarette, which made him assume that the Defendant had lost another job. The defense objected on the basis that Mr. Maness did not have personal knowledge that the Defendant had lost her job, and the court asked the State to lay a foundation for how Mr. Maness knew that the Defendant had lost jobs. When the State asked Mr. Maness why he had testified that the Defendant had lost jobs, he responded that the victim had told him that she had lost jobs. Defense counsel objected on the ground of hearsay, which was sustained by the court.

Mr. Maness also stated his opinion that the Defendant was a "possessive wife" and "just jealous." He said he based his opinion on the fact that the victim and the Defendant often argued about the victim talking to other women. He also noticed that when the victim was at his house, the Defendant would call three or four times. Defense counsel objected, and the trial court again sustained the objection on hearsay grounds. On cross-examination, the defense asked Mr. Maness if the victim was upset about the Defendant losing her jobs. Mr. Maness replied that when he saw the Defendant out on the patio and asked the victim if the Defendant was supposed to be at work, the victim responded that he guessed the Defendant had lost another job. Mr. Maness stated that based on the victim's statement, he "assumed that [the Defendant] had lost her job again." He acknowledged that he did not know where the Defendant was working at the time or what schedule she was working.

In its order denying the Defendant's motions for new trial, the successor court held that the trial court properly excluded portions of Mr. Maness's testimony that was hearsay:

> This court finds the trial court properly excluded hearsay testimony about specific instances of the defendant's jealous [nature] as relayed by the victim to [Mr. Maness] and properly admitted other testimony relating to [Mr. Maness's] opinion about the reputation of the victim for jealousy and possessiveness toward[] the victim.

The record supports the successor court's finding on this issue. Again, the Defendant never objected at trial at all to Mr. Maness's opinion that she was a "possessive wife" and "jealous," never argued that this opinion should not have been offered in the State's case-in-chief, and failed to argue on appeal that she did not open the door to that character evidence. See Tenn. R. App. P. 36(a); Tenn. R. Evid. 103(a)(1); Smith, 24 S.W.3d at 279-80; Killebrew, 760 S.W.2d at 235; see also Patterson, 593 S.W.2d at 917; Alder, 71 S.W.3d at 303. When Mr. Maness explained that he based his opinion that the Defendant was a "jealous" wife on the fact that the victim and the Defendant often argued about the victim talking to other women, defense counsel objected, and the trial court sustained the objection on hearsay grounds. Consequently, we conclude that the trial court sufficiently limited Mr. Maness's testimony on this topic.

Regarding Mr. Maness's statement on direct examination that the Defendant kept losing jobs, we note that the trial court cut the State short on this line of questioning when Mr. Maness admitted that he did not have personal knowledge that the Defendant had lost her job. Moreover, the defense elicited additional information on this issue when it asked Mr. Maness if the victim was upset about the Defendant losing jobs. Consequently, we conclude that the Defendant is not entitled to relief on this issue. See Tenn. R. App. P. 36(a); State v. William "Butch" Osepczuk, No. M1999-00846-CCA-R3-CD, 2001 WL 120716, at *4 (Tenn. Crim. App. Feb. 1, 2001) (concluding that the defendant waived any objection to evidence when he elicited the very testimony about which he complained).

The Defendant also argues that Mr. Maness's testimony on these two topics was irrelevant to whether the Defendant acted in self-defense and was "far more prejudicial than probative." However, the record shows that the defense did not object to Mr. Maness's testimony on these grounds at trial. Consequently, this issue is waived because the defense cannot change theories from the trial court to the appellate court. See Alder, 71 S.W.3d at 303 ("It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal."); State v. Dooley, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000) (same).

Finally, although the Defendant only briefly mentions Mr. Maness's testimony about her making an alleged shooting motion while she was sitting in the back of a police car, we feel it necessary to address this issue as well. The Defendant apparently contends that the trial court should not have admitted the testimony regarding the shooting gesture because it was irrelevant and prejudicial.

Mr. Maness testified that on December 23, 2009, he saw the Defendant sitting in the backseat of a patrol car in handcuffs. The Defendant looked directly at Mr. Maness and pointed her fingers at him as if she were firing a gun. Prior to presenting this testimony to

the jury, the court conducted a jury-out hearing, wherein it determined that the material issue, other than conduct conforming with a character trait, was that the Defendant's shooting gesture showed her "intent to shoot and kill." The court also found that the proof of the Defendant's shooting gesture was clear and convincing and that the probative value of this evidence, which indicated the Defendant's "intent" and "mindset" at the time of the offense, was not outweighed by the danger of unfair prejudice.

In denying the Defendant's motions for new trial, the successor court held that "[Mr.] Maness's testimony about the defendant's hand gesture was probative of the defendant's motive and intent." We agree. The court properly followed the procedure in Rule 404(b) before determining that the evidence was admissible. We conclude that the court did not abuse its discretion in admitting this evidence.

**C. Deanne Dixon and Ashley Montgomery.** The Defendant also argues that the trial court erred in allowing the State to question defense witnesses Deanne Dixon and Ashley Montgomery about the Defendant's contract not being renewed at Youth Villages, her alleged firing at Youth Villages, her aliases, her prior marriages and divorces, her financial history and bankruptcies, and her failure to pay her daughter's tuition. She claims these questions should not have been allowed because they were irrelevant and highly prejudicial.

When questioned by the State on cross-examination, Ms. Dixon testified that the Defendant went by the name of Pam Gray when she first met her. She said she never knew the Defendant as Pam Baker and was unaware that the Defendant had previously been married to Mr. Baker. When Ms. Dixon was asked if she knew why the Defendant's contract was not renewed at Youth Villages, she responded, "I left. After I recommended her for my job I left and moved to Vermont." The State then asked, "So you don't know why she was fired from there?" Ms. Dixon replied, "I don't." At that point, the defense objected on the basis that the State's question assumed facts that were not in evidence and asked that the question and her response be stricken from the record unless the State had a foundation for that question. Before the court had a chance to rule, the State asked Ms. Dixon if she knew that the Defendant's employment at Youth Villages had been terminated, and Ms. Dixon said, "I mean, I knew she didn't work there after a certain amount of time." During the ensuing bench conference, the State asserted that it got the information about the Defendant's contract not being renewed or the Defendant's termination from an employee at Youth Villages. The court ruled that the State would be allowed to pursue this line of questioning that if the State had a good faith basis for it. When the defense asked for the State to provide the documentation supporting the fact that the Defendant was fired from her job at Youth Villages, the State said that it would have to search through its records. The court suggested that the State ask Ms. Dixon whether a contract not being renewed at Youth Villages meant

the same thing as termination. After the bench conference, the State asked Ms. Dixon if she knew that the Defendant's contract had not been renewed, and Ms. Dixon responded that she did not.

When the State asked if Ms. Dixon knew anything about the problems the Defendant had during her marriage to Ronald Baker, the defense objected on the basis that this information was not relevant and was inadmissible pursuant to Rules 403 and 404. The court overruled the objection because this testimony went to "the credibility of the witness and how much she knew about [the Defendant]." When the State asked if Ms. Dixon knew that the Defendant had judgments against her and that the Defendant had filed for bankruptcy, the defense objected on the ground of relevance, and the court said, "Let's move on." Then the State asked Ms. Dixon if she knew the Defendant went by the names Pamela Atkins or Pamela Gracie, and the defense objected on the ground of "foundation." The court stated, "I thought we had discussed this." However, the court never specifically ruled on the objection regarding the Defendant's aliases. On redirect examination, the defense asked Ms. Dixon whether the Defendant's other names caused her to change her testimony about her work history and friendship with the Defendant, and Ms. Dixon responded, "No. I knew her as Pam Gray until I found out that [she] and [the victim] were getting married and then [I knew her as] Pam Taylor. I've never known her as anybody else."

In addition, the State on cross-examination asked Ashley Montgomery when she first knew the Defendant as Pam Taylor, and Ms. Montgomery replied that she knew her as Pam Taylor after she and the victim got married. When the State asked if she knew about the Defendant's divorce from Ronald Baker, Ms. Montgomery said, "I knew that it was a touchy subject and that I believe I recall that he was in jail. . . . I never [asked her about] it." Ms. Montgomery said that she was not aware of the Defendant's financial problems. The defense objected on the ground that this question had been asked and answered during direct examination. The State then asked if it would surprise Ms. Montgomery to know that the Defendant was unable to pay her daughter's tuition, that she never paid the outstanding tuition bill, that she had judgments against her, and that she had filed bankruptcy. Ms. Montgomery stated that these things were not surprising because the Defendant was a single mother with a nurse's salary. When the State asked Ms. Montgomery if she knew why the Defendant was not rehired or her contract was not renewed, Ms. Montgomery said, "As a matter of fact when I left my supervisory position with Youth Villages . . . I recommended [the Defendant] to take my position to my boss . . . . And [the Defendant] went and interviewed with her and turned down the position. She said [she turned down the job] because of the schedule." The defense never objected to this question at trial. When the State asked if the Defendant's contract was not renewed when she left Youth Villages in 2005, Ms. Montgomery said, "[I]t wasn't a contract." The State next asked her where the Defendant was working in 2008, and Ms. Montgomery said that she was not exactly sure,

although she knew that the Defendant worked for Dwayne Hutchinson at a staffing agency and had worked for a nursing home at one point. On redirect examination, Ms. Montgomery stated that if an employee at Youth Villages had been terminated, they would not be eligible for rehire.

Following Ms. Montgomery's testimony, the defense again asked for documentation to support the State's allegation that the Defendant had been terminated from Youth Villages:

> I'd like to be able to see this [documentation] in the event [that] your Honor needs to . . . instruct the jury to disregard the reckless comments by counsel. Because it's very dangerous when a prosecutor gets up, . . . you know how the case law looks at prosecutors and comments that they make. . . .
>
> But in any event, I wanted to see if the State has any foundation to throw that out [in front of the jury]. And I don't know if your Honor wants to take a recess and just order them to go ahead and look for it now while I'm examining my next witness. But I need to see if because the longer we allow this to sink in to the jury, examine other witnesses about it I think is dangerous.

The State responded that an employee at Youth Villages had told her that the Defendant's contract had not been renewed, and it had interpreted that to mean, perhaps incorrectly, that the Defendant had been terminated. It also acknowledged that Ms. Welch, the victim's mother, had also given the State that information. However, it asserted that any confusion about this issue was clarified when Ms. Montgomery stated that an employee who had been terminated would not have been rehired there. The State also asserted that the defense had opened the door to this evidence. After hearing from the attorneys, the court ultimately gave the following instruction to the jury on this issue:

> Ladies and gentlemen, in the opening jury charge that I gave you and in the closing jury charge that I will give you, any statements that lawyers make are not evidence in this case. The statement that [the Defendant] was fired or that her contract was not renewed is not accurate. So just disregard that.
>
> All right, let's move on.

The Defendant argues that the trial court erred in allowing the State to question Ms. Dixon and Ms. Montgomery about the Defendant's contract not being renewed at Youth Villages, her alleged firing at Youth Villages, her aliases, her prior marriages and divorces, her financial history and bankruptcies, and her failure to pay her daughter's tuition. She claims these questions should not have been allowed because they were irrelevant and

prejudicial. Although the successor court did not specifically rule on this issue, it found that "the limited trial court errors" did not necessitate the granting on of a new trial.

In regard to this issue, the court provided the jury with a curative instruction that attorneys questions were not evidence and that the State's assertion that the Defendant had been fired or that her contract had not been renewed at Youth Villages was not accurate. A jury is presumed to follow a trial court's instructions. State v. Banks, 271 S.W.3d 90, 134 (Tenn. 2008) (citing Young, 196 S.W.3d at 111 (Tenn. 2006); State v. Shaw, 37 S.W.3d 900, 904 (Tenn. 2001)). All of these questions were relevant because they established how well the Defendant's character witnesses knew her. See Tenn. R. Evid. 401, 402, 405(a). We also conclude that the probative value of these questions was not substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403.

**D. L.T.** The Defendant argues that the trial court erred in admitting L.T.'s testimony as rebuttal evidence. She claims that this testimony was irrelevant because it did not rebut testimony showing the Defendant's peaceful nature and served only to prejudice the jury against her.

In a hearing outside the presence of the jury, the State informed the trial court of its intent to present L.T., the victim's youngest daughter, as a rebuttal witness. It asserted that L.T. would testify that she and the Defendant "started out with a good relationship. Everybody getting along. And then things changed and [she and her sister, C.T.] became very fearful of [the Defendant,] and they were scared of her because her demeanor changed." The defense responded that it was entitled "to do a voir dire of [L.T.'s testimony] to . . . balance that to see if it's going to be more probative than prejudicial[.]" The defense added, "I'm concerned about the relevance of this [in] the grand scheme of things and the balance of this incident," and stated, "Your Honor, I think if it's going to be a 404(b) kind of analysis, I would like the Court to go through–I don't know if they're offering it for specific acts." The State responded that the testimony was "in rebuttal of her testimony that [the victim] changed during their situation living together, either because of the steroids or whatever and it's his children who were there every other weekend who are going to say he did not change, she changed." When the court asked whether this testimony was for the purpose of contradicting the Defendant's testimony, the State responded affirmatively.

L.T., the victim's thirteen-year-old daughter, testified that after the Defendant married the victim, she continued to see the victim every other weekend and things were going "pretty smoothly[.]" She stated that her relationship with the Defendant changed when she and her older sister, C.T., spent the night with the victim and the Defendant a month or two before the victim died. L.T. said that around 9:30 p.m., C.T. threw a phone against the wall, which made a noise. The Defendant came into the bedroom, turned off all the lights and

television, and told them to go to sleep. She said it seemed like the Defendant was "angry" with them at the time. After this incident, L.T. and C.T. were scared of the Defendant.

On cross-examination, L.T. acknowledged that she was eleven years old and C.T. was thirteen years old when the aforementioned incident occurred. She also acknowledged that she and her sister continued to visit the apartment after the Defendant had disciplined them because they wanted to see the victim. L.T. admitted that she had never seen the Defendant hit the victim and that the Defendant had never hit her or her sister, C.T.

On redirect examination, L.T. stated that the incident with the Defendant did not change the Defendant's attitude toward them because the Defendant wanted them to like her. However, she said, "[W]hat she did scared us, so it was more like our attitude toward[] her changed."

In its order denying the Defendant's motions for new trial, the successor court held that although the trial court should not have admitted this evidence, its admission of the evidence was not so prejudicial that it required a new trial:

> This court finds this testimony was irrelevant and should not have been admitted. The testimony did not rebut testimony demonstrating the victim had a peaceful nature. Even if the testimony could be construed to show some [type] of aggression on the part of the defendant, the validity of the testimony in light of the age and experience of the witness diminished its probative value. However, the court finds that the evidence was [not] so prejudicial as to require a new trial. Therefore, defendant is not entitled to relief based upon this claim.

We initially note that "the use of specific acts by the defendant to prove first aggression would be character proof of the defendant's propensity for violence" and would be governed by Rule 404 and Rule 405 of the Tennessee Rules of Evidence. State v. Henderson, No. 03C01-9804-CR-00139, 1999 WL 398087, at *5 (Tenn. Crim. App. June 18, 1999). Tennessee Rule of Evidence 404(a)(1) states in pertinent part:

> **(a) Character Evidence Generally.** Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

> (1) Character of Accused. In a criminal case, evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same or, if

-55-

evidence of a trait of character of the alleged victim of the crime is offered by the accused and admitted under Rule 404(a)(2), evidence of the same trait of character of the accused offered by the prosecution[.]

Here, it is clear that the Defendant "opened the door" to proof of her character when she presented evidence that the victim was the first aggressor and that she had acted in self-defense when she fatally shot the victim. See id.; State v. Jason Allen Cobb, No. W2011-02437-CCA-R3-CD, 2013 WL 1223386, at *13 (Tenn. Crim. App. Mar. 26, 2013), perm. app. denied (Tenn. Oct. 16, 2013) (stating that if a defendant places the victim's character for violence at issue, then the State may offer character evidence about the defendant's character for violence to rebut the same pursuant to Tennessee Rule of Evidence 404(a)(1)); Henderson, 1999 WL 398087, at *5 (noting that the defendant had not "opened the door" to evidence of his character based on the record); DAVID LOUIS RAYBIN, TENNESSEE PRACTICE, CRIMINAL PRACTICE AND PROCEDURE § 27:77 (2013), available at Westlaw TNPRAC–CRP ("When character evidence is introduced, the prosecution may rebut this proof by calling witnesses who will testify that the reputation of the defendant for the particular trait at issue is bad.") (internal footnote omitted). Moreover, Tennessee Rule of Evidence 405(a) states that in cases where evidence of character is admissible, proof may be introduced in the form of reputation testimony or testimony in the form of an opinion. However, this rule states that after applying to the court, inquiry on cross-examination is allowed into relevant specific instances of conduct, assuming that the following conditions are satisfied prior to such cross-examination:

> (1) [t]he court upon request must hold a hearing outside the jury's presence, (2) [t]he court must determine that a reasonable factual basis exists for the inquiry, and (3) [t]he court must determine that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues.

See Tenn. R. Evid. 405(a); see Crawford v. State, 273 S.W.2d 689, 691-92 (Tenn. 1954) (noting that "character or reputation can be proved only by evidence of general reputation in the community and not by specific acts nor from personal knowledge of the witness, and that evidence of good character cannot be rebutted by evidence of specific acts of misconduct or of rumors of same"). Consequently, the State should have been precluded from introducing evidence of the Defendant's specific act unless it was admissible for purposes other than character pursuant to Rule 404(b). See Henderson, 1999 WL at *5.

In this case, the State indicated that it was not going to offer L.T.'s testimony to establish a prior bad act by the Defendant but rather to rebut the Defendant's testimony that the victim had become more aggressive just prior to his death. When L.T. subsequently

testified about the specific act involving the Defendant shortly before the victim's death, the defense never objected to this testimony, never requested a 404(b) hearing, and later elicited testimony on this issue helpful to the defense. Specifically, the defense was able to get L.T. to admit that she and her sister were eleven and thirteen years old respectively at the time of the incident, that the Defendant was merely disciplining them for their misbehavior during the incident, and that the incident did not prevent L.T. or her sister from visiting the apartment in the future. Consequently, the Defendant is not entitled to relief on this issue. See Tenn. R. App. P 36(a) (noting that relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error."); Tenn. R. Evid. 103(a)(1) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence); Tenn. R. Evid. 404(b)(1) (stating that the court upon request must hold a hearing outside the presence of the jury to determine whether the evidence of other crimes, wrongs, or acts is admissible); see also Smith, 24 S.W.3d at 279-80 (holding that a failure to object to otherwise inadmissible evidence renders the evidence admissible).

**E. Cumulative Error.** The Defendant argues that the cumulative error of admitting the aforementioned testimony was so prejudicial that it warrants a new trial. Because we have already determined that the trial court did not abuse its discretion in admitting any of this testimony, we need not consider the cumulative effect of the alleged errors. State v. Hester, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.").

**VII. Prosecutorial Misconduct.** The Defendant argues that the State's extensive prosecutorial misconduct compromised her right to a fair trial. She claims that the successor court erred in denying her motion for new trial based on her allegations of prosecutorial misconduct and that each instance of misconduct "contributed to a permeating atmosphere of unfair prejudice and bias throughout the entirety of the case."

Prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). The trial court has substantial discretion in controlling the course of arguments and will not be reversed unless there is an abuse of that discretion. State v. Sexton, 368 S.W.3d 371, 419 (Tenn. 2012) (citing State v. Thomas, 158 S.W.3d 361, 412-13 (Tenn. 2005) (appendix)).

This court has recognized that there are five general categories of prosecutorial misconduct:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. See State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); Lackey v. State, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7-106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. See Cauthern, 967 S.W.2d at 737; State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. See Cauthern, 967 S.W.2d at 737; State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citing AMERICAN BAR ASSOCIATION, STANDARDS RELATING TO THE PROSECUTION FUNCTION AND THE DEFENSE FUNCTION §§ 5.8-5.9 COMMENTARY (ABA PROJECT ON STANDARDS FOR CRIMINAL JUSTICE, APPROVED DRAFT 1971)).

In determining whether the prosecutor's improper conduct could have affected the verdict to the prejudice of the defendant, this court should consider the following factors:

"(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case."

State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); see Goltz, 111 S.W.3d at 5-6.

**A. Presentation of False Evidence.** The Defendant argues that the State knowingly presented false evidence that the Defendant was terminated from her employment at Youth Villages. She asserts that although the prosecutor initially informed the court that evidence corroborating the claim of termination was in her file, she later acknowledged that this information had come from both an employee at Youth Villages and Diane Welch. The Defendant asserts that although the trial court gave a curative instruction regarding this evidence, this false information had a highly prejudicial effect on the jury.

The United States Supreme Court has held that "a conviction obtained through use of false evidence, known to be such by representatives of the State" violates due process. Napue v. Illinois, 360 U.S. 264, 269 (1959);   Similarly, this court has held:

> It is a well established principle of law that the state's knowing use of false testimony to convict an accused is violative of the right to a fair and impartial trial as embodied in the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, §§ 8 and 9 of the Tennessee Constitution.

State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993) (citing Pyle v. Kansas, 317 U.S. 213, 216 (1942); Mooney v. Holohan, 294 U.S. 103, 110 (1935); Hall v. State, 650 P.2d 893, 896-97 (Ok. Crim. App. 1982)). In order to succeed on a claim that the State knowingly presented false evidence or failed to correct false testimony or evidence, the defendant must prove by a preponderance of the evidence:   "'(a) that false or perjured testimony was admitted at trial, (b) that the state either knowingly used such testimony or knowingly allowed it to go uncorrected, and (c) that the testimony was material and deprived him of a fair trial.'" State v. Michael Smith, No. W2011-01630-CCA-R3-CD, 2013 WL 3702369, at *11 (Tenn. Crim. App. July 12, 2013) (quoting Roger Morris Bell v. State, No. 03C01-9210-CR-00364, 1995 WL 113420, at *8 (Tenn. Crim. App. Mar. 15, 1995)).

We have already detailed the State's questioning of Deanne Dixon and Ashley Montgomery regarding the Defendant's possible termination from her job at Youth Villages, so we will not repeat it here. When this issue was brought to the court's attention, the prosecutor stated that she had a good faith basis for questions on this issue because both an employee at Youth Villages and Diane Welch, the victim's mother, had told her that the Defendant's contract had not been renewed with Youth Villages. In its order denying the motion for new trial, the successor court found that the State did not have a good faith basis for asking about the Defendant's termination from Youth Villages but held that "in light of

the facts and circumstances . . . and the curative measures undertaken by the court, it is unlikely the prosecution's improper questions affected the outcome of the jury's verdict." We agree with the assessment of this issue and conclude that the Defendant is not entitled to relief on this issue.

**B. Closing Argument.** The Defendant also contends that the State committed several instances of prosecutorial misconduct during closing argument. Specifically, she argues that the prosecution improperly: (1) asserted that the Defendant never apologized to the victim's family during her testimony at trial; (2) misstated the evidence by claiming that Brittany said she never witnessed her father lay hands on her mother when, in fact, she testified that she saw the victim push the Defendant; (3) used a sweatshirt as demonstrative evidence even though it was not the sweatshirt collected from the crime scene; (4) insinuated that the defense's forensic analysis expert Lawrence Renner's testimony was unreliable because he conducted most of his work in Santa Fe, New Mexico; (5) stated that the Defendant "sat up here and told lie after lie after lie"; (6) asserted that the Defendant occupied her own world which was separate from "the real world"; (7) suggested that the Defendant felt no emotion about killing the victim in this case by stating that the Defendant was "making the noises, but I'm not sure if any tears were shed . . . her makeup sure didn't change"; (8) insinuated that the Defendant was an unfit parent because she had once slapped Brittany across the face and because Brittany routinely confided in her basketball coaches; (9) suggested that the Defendant's possible motives for committing the offense were her impending divorce from the victim and the victim's life insurance monies; (10) failed to mention that the Defendant could be found not guilty of any crime or could be found guilty of a lesser included offense; (11) stated that the victim "deserved better," even though the victim was found with steroids and marijuana in his system; and (12) stated that "you all know the side effects of marijuana are non-aggressive" to bolster the idea that the victim was a peaceful person.

The Tennessee Supreme Court has consistently held that "'closing argument is a valuable privilege that should not be unduly restricted.'" Reid, 164 S.W.3d at 320 (quoting Bane, 57 S.W.3d at 425); see Cauthern, 967 S.W.2d at 737. Closing argument gives each party an opportunity to persuade the jury of their theory of the case, see 11 DAVID L. RAYBIN, TENNESSEE PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 29.2, at 97 (2008), and to highlight the strengths and weaknesses in the proof for the jury. Banks, 271 S.W.3d at 130 (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence or make derogatory remarks or appeal to the jurors' prejudices." Banks, 271 S.W.3d at 131 (internal citations omitted). Moreover, we recognize that "[c]losing arguments in criminal cases have a 'rough and tumble quality' about them, State v. Skakel, 276 Conn. 633, 888 A.2d 985, 1060-61 (2006), because they are traditionally the one place in the trial where the lawyers are given the

greatest leeway in their manner of expression." Banks, 271 S.W.3d at 131 (citing 6 WAYNE R. LaFAVE ET AL., CRIMINAL PROCEDURE § 24.7(b), at 456-57 (3d ed. 2007)). Notwithstanding this leeway, a prosecutor's comments during closing argument must be "'temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law.'" Johnson, 401 S.W.3d at 20 (quoting State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999)).

Although the Defendant makes numerous complaints about the State's closing argument, she objected only one time during the State's closing argument, when the prosecutor commented that the Defendant had not apologized to the victim's family. The court promptly issued a curative instruction to the jury, wherein the court explained that it is "[g]enerally not admissible for a defendant to get on the stand and to apologize to a family during a trial." In light of this curative instruction and the substantial evidence of the Defendant's guilt, we conclude that this comment did not affect the outcome of this case. See Banks, 271 S.W.3d at 134 (holding that a jury is presumed to have followed the court's instruction during the State's closing argument); State v. Armstrong, 256 S.W.3d 243, 250 (Tenn. Crim. App. 2008) (concluding that the prosecutor's statements during closing argument did not affect the outcome of the trial given the overwhelming evidence of the defendant's guilt).

Regarding the Defendant's other assertions of prosecutorial misconduct, we agree with the State that the defense's failure to make contemporaneous objections at the time these comments occurred resulted in waiver of these issues. See Tenn. R. App. P. 36(a); Tenn. R. Evid. 103(a)(1). It is well recognized that a defendant's failure to object to a prosecutor's comments during closing argument rarely results in a reversal of the conviction:

> Unobjected to closing arguments warrant reversal only in exceptional circumstances. United States v. Smith, 508 F.3d 861, 864 (8th Cir. 2007). Accordingly, like the United States Court of Appeals for the Eighth Circuit, "[w]e bear in mind that fleeting comments that passed without objection during the rough-and-tumble of closing argument in the trial court should not be unduly magnified when the printed transcript is subjected to painstaking review in the reflective quiet of an appellate judge's chambers." United States v. Mullins, 446 F.3d at 758.

Banks, 271 S.W.3d at 132 n.30. We note that "where a prosecuting attorney makes allegedly objectionable remarks during closing argument, but no contemporaneous objection is made, the complaining defendant is not entitled to relief on appeal unless the remarks constitute 'plain error.'" Thomas, 158 S.W.3d at 413 (citing Tenn. R. App. P. 36(b); Smith, 24 S.W.3d at 282); see State v. Pack, 421 S.W.3d 629, 648 (Tenn. Crim. App. 2013) (holding that

because the defendant failed to make a contemporaneous objection during closing arguments, he not only had to establish that the comments were improper but also that they constituted plain error); State v. Gann, 251 S.W.3d 446, 458 (Tenn. Crim. App. 2007) (concluding that the defendant's failure to make a contemporaneous objection during the State's closing argument waived plenary review and allowed for consideration under plain error review only).

The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

"(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

Smith, 24 S.W.3d at 282 (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

We conclude that the Defendant has failed to establish plain error here. In denying the Defendant's motions for new trial, the successor court held that the State did not commit prosecutorial misconduct during its closing arguments:

The court does not find the prosecution committed prosecutorial misconduct in their argument to the jury. With the exception of the state's argument that the defendant did not apologize to the victim's family during her testimony, which the trial court addressed by curative instruction, this court does not find the state's arguments were outside the bounds of what the law allows. Moreover, given that the state was arguing for premeditated murder and the defendant was convicted of the lesser included offense of second degree murder, this court find[s] the prosecutor's comments, even if inappropriate, did not affect the jury's verdict to the prejudice of defendant. Therefore, defendant is not entitled to relief based upon this claim.

We agree with the successor court's assessment of the prosecutor's comments during closing arguments. Because the prosecutor's comments did not affect the outcome of the trial to the prejudice of the defendant, the Defendant cannot show that a substantial right of the accused must have been adversely affected. See Armstrong, 256 S.W.3d at 250. Because the Defendant failed to establish all five factors required for plain error, she is not entitled to relief on this issue. See Smith, 24 S.W.3d at 283.

C. **The Defendant's Last Names and Attractiveness.** The Defendant argues that the State's repeated references to her purported last names and her attractiveness were irrelevant and had a prejudicial effect on the jury. We conclude that the Defendant has waived these issues because she failed to support them with argument and failed to make appropriate references to the record. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Moreover, a brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on." Tenn. R. App. P. 27(a)(7). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987).

In its order denying the motion for new trial, the successor court noted that the State had asked several witnesses if they knew the Defendant by another name, referenced her previous divorces, and commented on the Defendant's attractiveness. However, the successor court held that the Defendant was not entitled to relief on these grounds:

> After a review of the record, this court finds such evidence was of marginal relevance. However, in the context of the entire proof presented at trial and the relative strength of the state's case, this court finds that any improper comment did not affect the verdict to the prejudice of the defendant.

We agree. Waiver notwithstanding, we conclude that the Defendant is not entitled to relief because the prosecutor's comments did not affect the verdict to the prejudice of the defendant.

D. **Discussion of a Pending Case and Rulings.** The Defendant also argues that the State committed prosecutorial misconduct by "[d]iscussing a pending case and rulings with the trial judge presiding over the proceedings." Although she includes no references to the record and no further explanation of this issue, we assume that she is referring to the ex parte communication between senior attorneys in the district attorney's office and the trial court.

-63-

Again, we conclude that the Defendant has waived these issues because she failed to support them with argument and failed to make appropriate references to the record. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7); Hammons, 737 S.W.2d at 552.

The successor court in its order denying the motion for new trial held that although "the attorneys involved in the ex parte communication acted improperly," it did "not find defendant was prejudiced by the prosecutor's actions." We agree with the successor court's assessment of this issue. Waiver notwithstanding, we conclude that the Defendant is not entitled to relief because the ex parte communication did not affect the verdict to the prejudice of the defendant.

**E. Approaching and Gesturing at the Defendant.** Lastly, the Defendant argues that the State committed prosecutorial misconduct during voir dire and opening statements by "aggressively and excitedly pointing at and gesturing towards [her]." She claims that the prosecutor's actions "had a chilling effect on the jury pool as well as unfairly prejudiced potential jurors before they were given the opportunity to hear the facts of the case and independently weigh them on their own merits." Once again, we agree with the State that the Defendant has waived these issues by failing to support them with argument and by failing to make appropriate references to the record. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7); Hammons, 737 S.W.2d at 552.

The successor court in its order denying the Defendant's motions for new trial held that the prosecutor did not act improperly in approaching the Defendant or gesturing at the Defendant and that even if the prosecutor's conduct was improper, "the defendant has failed to demonstrate that the trial was likely [a]ffected[.]" After reviewing the record, we agree with the successor court's assessment of the prosecutor's comments during closing arguments. Waiver notwithstanding, we conclude that the Defendant is not entitled to relief on this issue because the prosecutor's comments did not affect the verdict to the prejudice of the defendant.

**VIII. Exclusion of Evidence of the Victim's Violent Tendencies.** The Defendant contends that the trial court erred in excluding proof of the victim's reputation for violence and specific violent acts that was offered by the defense as corroborative evidence that the victim acted as the first aggressor. She argues that the court should have admitted evidence from Gordon Summerfield about the victim's reputation for being angry and aggressive. She also claims the court should have admitted the evidence from Robin Ost that the victim, in a fit of anger during a golf game, threw a club into a bag and loudly cursed.

As we previously noted, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence

of abuse appearing on the face of the record." Pylant, 263 S.W.3d at 870 (citing Dotson, 254 S.W.3d at 392; DuBose, 953 S.W.2d at 652; Van Tran, 864 S.W.2d at 477; and Harris, 839 S.W.2d at 73). Generally, evidence of a defendant's character offered for the purpose of proving that he or she acted in conformity with that character is inadmissible. See Tenn. R. Evid. 404(a), 404(b). However, there are exceptions to this general rule depending on whether the proof is offered under Rule 404(a) or Rule 404(b). See State v. Mickey Lee Williams, No. E2013-01110-CCA-R3-CD, 2014 WL 465638, at *4 (Tenn. Crim. App. Feb. 4, 2014).

This court has noted that "[t]here is a distinction between evidence of prior acts of violence by the victim used to corroborate the defense theory that the victim was the first aggressor and that used to establish the defendant's fear of the victim." State v. Ruane, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995). As in this case, when evidence of a victim's character is used solely to corroborate the defendant's claim that the victim was the first aggressor, this evidence may be admitted during the direct testimony of a witness. Ruane, 912 S.W.2d at 779; State v. Hill, 885 S.W.2d 357, 361 n.1 (Tenn. Crim. App. 1994); State v. Furlough, 797 S.W.2d 631, 649 (Tenn. Crim. App. 1990). Before the defense introduces proof of a victim's character to corroborate the claim that the victim is the first aggressor, "the evidence must establish an issue which makes such evidence relevant, and, therefore, admissible." State v. Robinson, 971 S.W.2d 30, 40 (Tenn. Crim. App. 1997). In addition, before proof of a victim's character that corroborates the claim that the victim was the first aggressor is admitted, the following conditions must be satisfied:

> Self defense must be at issue by the evidence in the record, not by the words and statements of counsel. The trial judge must then determine if there is a factual basis underlying the allegations of tendencies of first aggression. Then the trial judge must determine whether or not the probative value of the evidence is . . . outweighed by the danger of confusion of the issues, or misleading the jury. . . .

Ruane, 912 S.W.2d at 781 (quoting State v. Laterral Jolly, No. 02C01-9207-CR-00169, 1993 WL 523590, at *4 (Tenn. Crim. App. Dec. 15, 1993)).

In its order denying the Defendant's motions for new trial, the successor court held that the trial court did not err in excluding Mr. Summerfield's and Ms. Ost's testimony:

> This court finds the trial court properly excluded [Mr.] Summerfield's testimony. The testimony offered was that the victim had a reputation not for violence or animosity toward the defendant. Rather, the evidence was that the victim had a reputation for being angry or having a "short fuse." This court

-65-

finds the trial court properly concluded that evidence did not fit within the realm of evidence contemplated by cases such as Saylor and Butler and was not properly admissible as part of a theory of self defense. Likewise, this court finds the trial court properly determined the incident relayed by [Ms.] Ost was not proper character evidence demonstrating the victim's violent tendencies.

**A. Gordon Summerfield.** During Gordon Summerfield's direct examination, the defense asked him if he was familiar with the victim's reputation, and he replied, "I heard things but I could not firsthand testify to anything." The State objected to this testimony on the ground of hearsay. At the ensuing jury-out hearing, the defense argued Mr. Summerfield's testimony about the victim's reputation should be admitted as an exception to hearsay under Tennessee Rule of Evidence 803(21), reputation as to character among associates.

During the offer of proof, Mr. Summerfield testified that he had heard "various stories" about the victim's behavior from parents whose children played basketball with the victim's daughter. Specifically, he had heard that the victim had a "temper[,]" was "short fused[,]" and argued with others. He said these stories about the victim were from reliable sources. Mr. Summerfield said he first began hearing these stories in "maybe 2006, 2007[.]" On cross-examination, Mr. Summerfield acknowledged that he did not know the victim and that he did not know if these stories he had heard about the victim were true. He also did not know how the other basketball parents knew of these stories. He said he did not know the circumstances in which the victim had a temper or a short-fuse, and the only specific incident that he had heard was from a husband and wife who had played golf with the victim and the Defendant and who said that the victim had an outburst while playing golf. Mr. Summerfield admitted that he did not know whether the victim physically harmed anyone during this outburst.

After hearing the offer of proof, the court held that the pertinent issue was whether the victim had a reputation for violence, not a reputation for anger:

> I don't read this rule as allowing [it] under Rule 404(a), if you read it 404(a)(2), character of the victim. And then when you read the case law under it, it's about violent acts, prior violent acts. And you look at 405 and [testimony about] this person's reputation or their opinion about him for being a person of violence or a person of peacefulness. That's what the case law talks about, not a person prone to anger.

After hearing arguments from both parties, the court said that the evidence had to be admissible under Rule 404(a) before it could be considered under Rule 803(21). The State

asserted that the proper person for this testimony would be the person who actually saw the victim's behavior on the golf course. Ultimately, the court denied the defense's request for Mr. Summerfield to testify about the victim's reputation:

> I believe the case law is clear and the rule is clear that the only testimony that is admissible in this situation is that of opinion or reputation for acts of violence or threats of violence and I don't believe that anger issues, short fuse, arguing with other parents, something that occurred on a golf course that wasn't pleasant either during the game or afterwards qualifies under the rule to be admissible. You have made your offer of proof. It is part of the record. I understand your position. But it is denied.

We initially note that Mr. Summerfield's testimony should be analyzed under Rule 404(a) because Summerfield was testifying about the victim's general character, rather than a specific prior act, which is governed by Rule 404(b). See Mickey Lee Williams, 2014 WL 465638, at *4. Rule 404(a)(2) allows for the accused to present evidence of a pertinent trait of character of the alleged victim. If a defendant asserts a self-defense claim, then Tennessee Rule of Evidence 404(a)(2) "'permits the defendant to offer proof of the victim's "pertinent" character for violent behavior to help establish that the victim was the aggressor.'" State v. Deeric McAfee, No. E2010-01730-CCA-R3-CD, 2013 WL 794330, at *9 (Tenn. Crim. App. Mar. 4, 2013) (quoting NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.04[5][c] (LEXIS publishing, 6th ed. 2011)).

Here, the trial court found that the issue of self-defense was properly raised by the evidence. However, the trial court properly excluded Mr. Summerfield's testimony after determining that it was irrelevant to the issue of self-defense because it concerned the victim's reputation for anger rather than the victim's reputation for violence. We also agree with the successor court that Mr. Summerfield's evidence did not fit with the cases State v. Saylor, 117 S.W.3d 239 (Tenn. 2003) and State v. Butler, 626 S.W.2d 6 (Tenn. 1981). Although the Defendant was entitled to present testimony from individuals about the victim's general character for violence to corroborate her claim that the victim was the first aggressor, Mr. Summerfield's testimony was not relevant on the issue of the victim's first-aggressor tendencies. Accordingly, the Defendant is not entitled to relief on this issue.

**B. Robin Ost.** During a jury-out hearing, the defense stated that it wanted to present testimony from Robin Ost, who would testify about a specific act regarding the victim's behavior on the golf course. The defense argued that the victim's anger on the golf course showed his aggression and rebutted the State's claim that the victim was a peaceful person. It argued that to "limit violence to an attack upon someone else is a very narrow interpretation of what . . . violence means." The court asserted that it did not "think that

every man that slams his golf club down . . . [is] going to attack [his] wi[fe] or threaten to snap [her] neck."

During the subsequent offer of proof, Robin Ost, a defense witness, testified that in the fall of 2009, she and her husband played golf with the Defendant and the victim. Ms. Ost said that on the seventh hole, the victim hit a short shot and then "violently threw his club in the bag and [started] cussing." For the remainder of the game, the victim got mad, cursed, and slammed his clubs after making a bad shot. She said that during these outbursts, the Defendant sat in the golf cart "with her head down" and did not say anything to the victim because she appeared to be "scared to say anything." Ms. Ost said that she had played golf for fifteen years and had never see anyone act like the victim during a golf game. She also said that she would never characterize the victim's behavior and disposition as peaceful. On cross-examination, Ms. Ost acknowledged that the victim never threatened to hit anyone with his golf club during the aforementioned incident.

Following this testimony, the court held that this specific act of violence was not admissible under Rule 404(a) because the testimony went to the victim's anger rather than his violence:

> I'm certainly not allowing in any information about the golf game. That goes to anger, and I thought it involved him taking a golf club to a tree. We don't even have that.
>
> So, some anger and cursing is not admissible. It does not show violence, in my opinion, and it's not admissible under 404(a), and I will not allow that.

Here, although the court analyzed this evidence under Rule 404(a)(2), we conclude that Ms. Ost's testimony should have been analyzed under Rule 404(b) because it concerned a specific prior bad act by the victim. See Mickey Lee Williams, 2014 WL 465638, at *4. Rule 404(b) states that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. However, the rule states evidence of other crimes, wrongs, or bad acts may be admissible for "other purposes" if this evidence satisfies the conditions in Rule 404(b). The following conditions must be satisfied before allowing such evidence under Rule 404(b):

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct

conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The term "other purposes" in the aforementioned rule has been defined to include motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. Berry, 141 S.W.3d at 582 (citing State v. Robert Wayne Herron, No. M2002-00951-CCA-R3-CD, 2003 WL 151201, at *2 (Tenn. Crim. App. Jan. 22, 2003)).

In this case, the trial court excluded the evidence after determining that Ms. Ost's testimony was irrelevant because it showed the victim's anger rather than violence. See Tenn. R. Evid. 401, 402. Although the trial court should have excluded Ms. Ost's testimony because it was not admissible to prove intent, motive, etc., we conclude that the trial court did not abuse its discretion in excluding this evidence. Therefore, we conclude that the trial court did not abuse its discretion in excluding Ms. Ost's testimony on this issue.

**IX.** **Sufficiency of the Evidence.** The Defendant argues that the evidence is insufficient to sustain her conviction for second degree murder. She claims that the State failed to negate her claim of self-defense beyond a reasonable doubt. To buttress her claim of self-defense, the Defendant references the hairs found in the victim's hand, the damage to the wall, the substantial amount of steroids in the victim's system, and Mr. Maness's testimony that he was worried about the victim on December 22, 2009, because he could tell the victim was upset. The Defendant also asserts, under our prior standard for circumstantial evidence cases, that the State's evidence was not "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant[.]" State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971), overruled by State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011).

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support findings by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. Odom, 928 S.W.2d at 23. When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." Dorantes, 331 S.W.3d at 379 (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379 (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

The Defendant was convicted of second degree murder, which is defined as "[a] knowing killing of another[.]" T.C.A. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). Whether a defendant acts knowingly in killing another is a question of fact for the jury. State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010); State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer intent from the character of the assault, the nature of the act, and from all of

the circumstances of the case in evidence. Inlow, 52 S.W.3d at 105 (citing State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

The Defendant argues that the evidence shows that she acted in self-defense when she fatally shot the victim. Tennessee Code Annotated section 39-11-611(b)(2) provided for the defense of self-defense at the time of the incident in this case:

[A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2) (Supp. 2009). The jury, as the trier of fact, determines whether the defendant acted in self-defense. Dooley, 29 S.W.3d at 547 (citing State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997)). "[I]n the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). The State has the burden of negating the defendant's claim of self-defense in the event that "admissible evidence is introduced supporting the defense." T.C.A. § 39-11-201(a)(3) (2003).

In the order denying the Defendant's motions for new trial, the successor judge held that the evidence presented at the Defendant's trial was sufficient to sustain her conviction for second degree murder:

The defendant was charged with first degree premeditated murder. The jury found her guilty of the less culpable crime of second degree murder. This court finds the evidence supported the jury's determination that the [defendant] knowingly killed the victim. The evidence showed that the day before the murder the [defendant] obtained a weapon and the next morning the defendant hid the weapon in her shirt, and later, during an argument, confronted the victim with the weapon and subsequently shot and killed the victim. The defendant admitted shooting the victim. Thus, the only issue before the jury was intent. Despite defendant's assertions that she acted in self-defense, the jury evidently rejected such claims and accredited the testimony of the state's

witnesses on this issue. However, the jury also rejected the state's assertion that the defendant acted with premeditation. Rather, the jury found that the defendant knowingly shot the victim. This court finds the evidence does not preponderate against the jury's finding. Therefore, defendant is not entitled to relief based on this claim.

Viewing the evidence in the light most favorable to the State, we conclude that a reasonable jury could have found that the Defendant was guilty of second degree murder beyond a reasonable doubt. The undisputed evidence at trial was that the Defendant shot the victim two times, in the heart and the head, with a Smith and Wesson .38 caliber revolver. The Defendant admitted that she shot the victim and that she had hidden the revolver in the sleeve of her oversized sweatshirt prior to firing the fatal shots. The evidence at trial showed that the day before the shooting, the Defendant bought the murder weapon and hollow point bullets after pawning some of her jewelry. She returned to the apartment and hid in their daughter's bedroom with the lights out. The next morning, after the victim had left for work, she left her daughter's bedroom and entered into the master bedroom, where she stayed until she fatally shot the victim when he returned home. After the shooting, while she was sitting in the back of a patrol car, the Defendant looked at the victim's friend, Timothy Maness, and pointed her fingers at him as if she were firing a gun.

At trial, the Defendant claimed that she killed the victim in self-defense. Although the Defendant claims that the victim choked her and tried to snap her neck before she shot him; she had no injuries. Vivian Williams, the 9-1-1 operator who answered the Defendant's call the day before the incident, stated that although the victim screamed that she was being attacked, the background noises during the call did not indicate that an attack was occurring. Officers Harber and Gaddy, who responded to the 9-1-1 call the day before the shooting, declined to fill out a domestic violence report because the Defendant had no injuries, and there were no signs of a physical altercation. Officer Downs, Officer Mise, Sergeant Quinn, and Sergeant Brown noted that the Defendant had no injuries and no blood on her when they arrived at the crime scene. Officer Garey stated that he used a special light to detect bruising underneath the surface of the Defendant's skin but found no indication that the Defendant had been injured. Moreover, Officer Downs, Officer Merritt, Sergeant Brown, and Officer Garey testified that the crime scene looked like it had been "staged" because some of the chairs looked like they had been knocked over and some of the furnishings looked like they had placed on the ground, but nothing was broken. Aaron Lamey testified that he lived in the apartment directly above the apartment shared by the Defendant and the victim and that prior to December 23, 2009, he had never heard any signs of violence coming from the victim's apartment. Timothy Maness, Officer Greer, and Wendy Taylor, the victim's ex-wife, testified that the victim was not a violent or aggressive person and was, in fact, non-confrontational. We note that it is the jury's duty to resolve conflicts in the evidence. See

Odom, 928 S.W.2d at 23. After hearing all of the proof, the jury rejected the defense's theory of self-defense and found that the Defendant had knowingly killed her husband. We will not second-guess the jury's decision because there is sufficient evidence to sustain the verdict.

**X. Sentencing.** The Defendant claims that the trial court abused its discretion in sentencing her to twenty-one years in confinement for her conviction for second degree murder. Specifically, the Defendant argues that the trial court failed to follow the purposes and principles of the sentencing act in the following ways: (1) the trial court did not allow her to call Robin Ost to discuss the victim's violent character; (2) the court ignored testimony from Duane Hutcheson, her former boss, about her work ethic and abilities, which related to her potential for rehabilitation; (3) the trial court relied on information outside the record when it stated that "the jury voted eleven to one in favor of conviction for murder in the first degree"; (4) the court failed to listen to all of the Defendant's witnesses and "attempt[ed] to surmise" what these witnesses would have said without allowing an offer of proof; (5) the trial court ignored many of the applicable mitigating factors, such as the fact that she acted under strong provocation, that substantial grounds tended to excuse or justify her criminal conduct, and that she acted under duress pursuant to Tennessee Code Annotated sections 40-35-113(2), (3), and (12); (6) the trial court made a finding that was contrary to the evidence when it found that the victim did not have high levels of steroids in his system at the time of his death, despite Dr. Robert's testimony to the contrary; (7) the trial court dismissed all of her positive character attributes, including the fact that she was a good mother, an excellent employee, and had no criminal history, by finding that she was "supposed to be" all of these things; (8) the trial court was unwilling to consider her mitigating evidence and to remain objective when it stated that the reviewing court would "skip over [the record] quickly" when considering the defense's assertions about hypothetical criminal acts committed by the victim.

At the Defendant's sentencing hearing, the defense presented testimony from Duane Hutcheson, Dr. Anne McSpadden, Peggy Barks, Sharon Hays, Abigail Chism-Smith, and Deonne Bobo. The defense also gave the Defendant an opportunity to make a statement of allocution.

Duane Hutcheson testified that the Defendant had worked for his company as a nurse for approximately a year before the victim's murder. He stated that the Defendant was a "model employee" and that she was well-liked by his clients.

Dr. Anne McSpadden, a psychologist, testified that she had met with the Defendant three times before trial and had evaluated her. Based on this evaluation, Dr. McSpadden diagnosed the Defendant with depression and Post-Traumatic Stress Disorder, which she said

was expected because the Defendant had killed her husband and was facing a long prison term. Through their meetings, Dr. McSpadden learned that the Defendant and the victim "had a very long and very difficult relationship" consisting of many breakups and "allegations of mistreatment and abuse." As for the Defendant's state of mind at the time of the murder, Dr. McSpadden stated: "I think [the Defendant was] likely to have seen herself–her options as very limited. . . . I think her need to be in a relationship was so strong that she was probably just terrified with the aspect of being abandoned and I think that probably had an effect on her." However, Dr. McSpadden concluded that the Defendant was not insane at the time of the offense and could appreciate the wrongfulness of her conduct.

Peggy Barks, the Defendant's mother, testified that the Defendant was an "excellent mother" to Brittany and was well-liked by her co-workers. She stated that the Defendant's relationship with the victim was not a healthy one because the victim was manipulative and did not have the same values as her daughter. She said she had personally observed the Defendant grieving over the victim's death. Ms. Barks believed that the victim had intended to kill the Defendant the morning of the incident and that God had saved the Defendant's life. She said the Defendant did "not deserve to be punished for saving her own life."

Sharon Hays testified that she and the Defendant had been friends for the last fifteen years. Ms. Hays said that the Defendant was a good mother, a positive role model for others, and her daughter's godmother. She stated that the Defendant was grieving over her husband's death.

Abigail Chism-Smith testified that she had previously worked with the Defendant. During the time period from 2006 to 2008, Chism-Smith saw the Defendant trying to cover bruises on her neck and a scratch under her eye with makeup. She also said there were several times that she noticed bruises on the Defendant after the Defendant married the victim.

Deonne Bobo testified that she had worked with the Defendant during the Defendant's marriage to the victim. When the Defendant told her that her marriage was not a good one, Ms. Bobo had tried to help her by giving her advice.

The Defendant made the following statement of allocution:

First, I want to express my sincerest grief [about] the loss of [the victim] the father of my child and my friend. I never wanted to do the situation [the victim] and I found ourselves in to Britt[any] and then to our families and friends and everybody involved. I know that I grieve with you-all and the day of [December] 23rd, 2009, is . . . a day of pain and grief that will

live with us forever. Our grief for the loss of someone we all loved can never change.

I respectfully ask Your Honor to look at my entire life, my concern for others, and the respect for authority, and give me a sentence that reflects a good life that I tried to live. I'm not perfect but I tried to live a life and thank you and I accept responsibility and apologize.

The State presented testimony from Michael Taylor, Diane Welch, George Welch, and Wendy Taylor at the sentencing hearing.

Michael Taylor, the victim's father, testified that he was "angry" and "grief stricken" over his son's murder. He asked that the Defendant be sentenced to the maximum sentence of twenty-five years.

Diane Welch, the victim's mother, testified that the victim was a wonderful son and father. She stated that the victim would drop by her house or call her every day. She stated that her son was never violent, was a hard worker, and won an award in 2009 for supervisor of the year. She said that since her son's murder, her "heart aches every day. I can't work. I see a psychiatrist." Ms. Welch stated that her inability to work had caused her family "financial distress" and that she took medication to "get through the day." She asked the court to sentence the Defendant to twenty-five years but said that the maximum sentence was "not near enough for her."

George Welch, the victim's step-father, testified that after the victim's murder, his wife was unable to work and cried herself to sleep every night. Mr. Welch stated that he had a lot of respect for the victim and was "proud to call him my son." He asked the court to sentence the Defendant to the maximum sentence.

Wendy Taylor, the victim's ex-wife, stated that she had been married to the victim for seven years and that they had two children together. She stated that the victim was a "wonderful father" who loved his children very much. Wendy stated that despite the Defendant's claims to the contrary, the victim did not "dominate" or "possess" women. She said the victim's murder had caused their children to be angry, depressed, and withdrawn. Wendy said she "wake[s] up every day exhausted from the day before because I'm trying to be mom and dad." She asked the court to sentence the Defendant to the maximum sentence.

In considering the propriety of the Defendant's sentence, we note that the 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this

broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed."  Id. at 706.  Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b).  The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Comments.  In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102, -103.  In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

The record shows that the trial court considered the evidence presented at trial and sentencing, the presentence report, the principles of sentencing and arguments relating to sentencing alternatives, the nature of the Defendant's criminal conduct, the enhancement and mitigating factors, and the Defendant's own statement.  The court determined that the Defendant was a Range I offender and faced a sentence of  fifteen to twenty-five years for

her conviction for second degree murder. See id. §§ 40-35-112(a)(1), -501(i)(1), -501(i)(2)(B).

The court applied the enhancement factor that the Defendant possessed or employed a firearm during the commission of the offense. See id. § 40-35-114(9). Under the "catch-all" mitigating factor, the court considered the Defendant's character witnesses and letters from members of the community. See id. § 40-35-113(13). It also considered the fact that she had been a good mother, a good worker, a good friend, and had no criminal record. However, the court did not give much weight to this mitigating proof because "that's what responsible adults are supposed to do." The court stated that it did not believe the Defendant's claim that the victim was attempting to break her neck at the time she shot him, and she told the Defendant that she "never should have bought that gun the day before [the murder]."

The court noted that this was a "horrible crime." Before sentencing the Defendant, the court explained:

> Considering the severity of the offense, considering the fact that . . . [the victim] had a lot to offer his family, to the community, considering the fact that you had a lot going for you and it's . . . just an awful case. I–I'm not going to give you the maximum but I'm certainly not going to give you the minimum. I'm going to sentence you to twenty-one years [in] the Tennessee Department of Corrections as a violent offense, one-hundred percent."

The court stated its belief that the Defendant had "some potential for rehabilitation once [she] serve[d] her sentence," which was why the court sentenced her to a sentence less than the maximum sentence. The court also asserted that it sentenced the Defendant to twenty-one years because of the "seriousness of the offense, the need to deter further crime such as this, the fact that she employed a firearm in such a manner[.]"

The Defendant argues that the trial court failed to consider much of the Defendant's mitigating proof. In its order denying the Defendant's motions for new trial, the successor court held that it found no bias in the trial court's sentencing of the Defendant. In addition, it found that "[w]ith regard to defendant's argument that the trial court misapplied the law, including the court's application of enhancing and mitigating factors, this court . . . finds no error." We agree with the successor court that the trial court did not err in its application of mitigating and enhancement factors. Although the Defendant argues that the trial court erred in not allowing her to call Robin Ost to discuss the victim's violent behavior on the golf course, the record shows that the trial court heard Ms. Ost's testimony about the victim's outburst during an offer of proof at trial. Moreover, although the Defendant claims that the

court ignored testimony from Duane Hutcheson, the Defendant's former boss, who testified as to the Defendant's work ethic and abilities, which related to her potential for rehabilitation, and dismissed testimony that she was a good mother, an excellent employee, and had no criminal history, the record shows that the court properly applied mitigating factor (13) in response to the defense's proof but declined to give this factor much weight. We conclude that the court did not err in declining to give additional weight to factor (13). Furthermore, the record shows that the trial court considered the Defendant's potential for rehabilitation based on the proof when it sentenced her to a sentence less than the maximum sentence in the range. Finally, we conclude that the trial court did not err in refusing to apply the mitigating factors that she acted under strong provocation, that substantial grounds tended to excuse or justify her conduct though failing to establish a defense, and that she acted under duress pursuant to Tennessee Code Annotated sections 40-35-113(2), (3), and (12) because the proof did not support application of these factors.

The Defendant also argues that the trial court relied on information outside the record in sentencing her. At the sentencing hearing, the State asserted that one of the jurors might testify about the Defendant's "sentence and the effect on the community." Defense counsel objected, stating, "[U]nless we want to hear from the entire jury as related to how they feel [the crime] impacted the community, then it's not fair to hear from just one particular juror." The trial court replied:

> I agree. Let me just say this. I understand the jury voted eleven to one in favor of conviction for murder in the first degree so I don't think you want to hear from the other jurors but this jury is not qualified to talk about how this crime has impacted the community[.]

Defense counsel, based on the aforementioned statement, asked the trial court to recuse itself from sentencing the defendant. The trial denied this request. At the hearing on the motion to recuse, the trial judge stated that following a jury verdict, she typically gives certificates to jurors to thank them for their service:

> . . . I went back, as I always do in every single case; and as many of the judges here do–I went back to thank the jurors and ask them if they had any questions; and they always have questions, and they always want to talk about the case and see–you know, ask me questions about this and this; and sometimes I can answer them. They usually want to talk about the attorneys, and they did. Someone just blurted out, you know, "We were eleven to one." I did not ask–I never ask–it's been drilled into me, you know, . . . that whenever . . . there's a problem with deliberations as far as reaching a verdict, never, ever ask about the numbers–don't let them tell you if you can prevent

it. So, I never ask; and I certainly didn't with this group; but it came out. And . . . [a]fter I got through talking with them, they wanted to talk to the attorneys, and they spoke to both sides.

So, you all had a chance to speak with them, and I believe you took that opportunity. I don't see how any of these things prejudiced [the Defendant] from having a fair trial; and it certainly did not affect me in sentencing her. I did not give her the maximum.

The successor court held that the trial court's knowledge, post-verdict, that the jury voted eleven to one to convict the Defendant of first degree premeditated murder did not influence the trial court's sentencing determination:

The court finds that, under the law that existed at the time of the defendant's sentencing, the trial court did not abuse its discretion in failing to recuse itself based solely upon the fact that the jury had, post-verdict, spontaneously announced its breakdown on guilt/innocence. The trial judge did not solicit such comments and stated on the record that this knowledge had no influence on her sentencing determination. The court made clear findings on the record regarding sentencing and articulated her reasons for imposing the sentence in this case.

Although the Defendant claims that the trial court relied on information that the jury initially voted eleven to one to convict her of first degree murder, the record fails to show that trial court considered this information in sentencing her. At the hearing on the motion for recusal, the trial court said that the unsolicited remark from a juror, post-verdict, had no influence on the sentence she imposed, and the Defendant has failed to establish otherwise.

In addition, the Defendant argues that the trial court erred in failing to allow all of her witnesses to testify during the sentencing hearing and erred in surmising what these witnesses would have said without an offer of proof. The record shows that the trial court was concerned that there would not be enough time to finish the sentencing hearing because the defense was having individuals testify who had also provided letters in support of the Defendant that were admitted into evidence. The court was also concerned that much of the witnesses' testimony was cumulative. After reviewing the transcript of the sentencing hearing, we conclude that the court indicated to both the State and the defense that time at the sentencing hearing was of the essence and that there was no need to present witnesses who were cumulative to one another or cumulative to their testimony at trial. Accordingly, we conclude that the trial court did not abuse its discretion in placing reasonable limitations on the proof offered at the Defendant's sentencing hearing.

The Defendant also claims that the trial court made a finding that was contrary to the evidence when it determined that the victim did not have high levels of steroids in his system at the time of his death. The record indicates that Dr. Robert testified that the victim's levels of Nandrolone were higher levels than what is naturally produced by the body, which indicated the possibility that the victim was using an anabolic steroid. Dr. Robert also testified that his testing revealed a very low level of epitestosterone compared to a high level of testosterone, which also suggested the use of an anabolic steroid. Because the evidence did not show that the victim had high levels of steroids in his system at the time of his death, the Defendant is not entitled to relief on this issue.

Finally, the Defendant asserts that the trial court showed its inability to be impartial when the court stated that the appellate court would "skip over" the record from the sentencing hearing. The record shows that the trial court made this comment when the defense was presenting a lengthy hypothetical argument about whether the victim could have been charged with assault and unlawful possession of a controlled substance during the sentencing hearing. When the State commented that it did not know what the court of criminal appeals would do with this portion of the record, the trial court replied, "Skip it, skip over it quickly I think." In the order denying the Defendant's motions for new trial, the successor court found that the Defendant had "completely mischaracteriz[ed] the trial court's comments," stating:

> During the court's ruling, the defendant proceeded to offer additional arguments regarding the application of certain mitigating factors. In response to "hypotheticals" being offered by the defense, the State interjected, stating, "I don't know where we are in this process, and we can perfect this for the record; but, quite frankly I don't know what the Court of [Criminal] Appeals would do with this part of the record." The court replied, "[S]kip it. Skip over it quickly." It appears the court was talking about the lengthy hypotheticals that were being offered by both sides and the arguments that had been repeated by each side more than once. It does not appear that the trial court was referring, as the defendant suggests, to the appellate court's overall review of its sentencing findings.

We agree with the successor court that the trial court was not referring to this court's review of its sentencing findings when it made this comment. We have already concluded that the trial court was impartial in this case, and this rather innocuous comment does not cause us to reach a different conclusion here. Accordingly, the Defendant is not entitled to relief on this issue.

The trial court sentenced the Defendant to twenty-one years, four years less than the maximum sentence in the range for a conviction for second degree murder. Because the trial court imposed a sentence within the appropriate range, considered the purposes and principles of the sentencing act, and considered the appropriate enhancement and mitigating factors, we uphold the Defendant's sentence of twenty-one years. See Bise, 380 S.W.3d at 706-07. The trial court's judgment is affirmed.

## CONCLUSION

The Defendant is not entitled to relief on her claims. Accordingly, we affirm the judgment of the trial court.

                             _____

                             CAMILLE R. McMULLEN, JUDGE